F I L E D
United States Court of Appeals
Tenth Circuit

MAR 5 1999

PATRICK FISHER
Clerk

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RICHARD PANYARD,

Defendant-Appellant.

No. 98-1117
(D.C. No. 96-CR-231-B)
(Colorado)

## ORDER AND JUDGMENT*

Before **SEYMOUR**, Chief Judge, **BALDOCK** and **HENRY**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The cause is therefore ordered submitted without oral argument.

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, or collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

The defendant, Mr. Richard Panyard, pled guilty to one count of conspiracy to commit mail fraud, wire fraud and securities fraud in violation of 18 U.S.C. §§ 1341 and 1343; 15 U.S.C. §§ 78 j(b), 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 371. In addition to thirty months of incarceration, the district court ordered Mr. Panyard to pay restitution to the victims in the amount of $534,469.60. Mr. Panyard appeals the district court's assessment of his ability to make monetary restitution and the calculation of attributable loss affecting his sentence. We AFFIRM.

Mr. Panyard along with two other co-defendants controlled Pros International, Inc. (Pros), an investment company. Mr. Panyard was also the minister and spiritual leader of Followers of the Way International Church in Boulder, Colorado, a small Christian congregation. To finance Pros, Mr. Panyard and his co-defendants began to fraudulently induce private individuals, primarily church members, to invest in Pros. Under Mr. Panyard's guidance, dozens of people directly invested money into Pros; others pledged collateral to help Pros secure loans. One of the largest guarantors was Kathleen Shea, a member of the Followers church, who pledged her full inheritance of over $170,000 in stock as collateral to secure loans. When Pros collapsed in 1991, the financial investments in the company had accumulated to over $700,000. Most of the money was lost, and Ms. Shea's stock was forfeited to offset losses from defaulted loans. Leaving

behind this debt and his ministry, Mr. Panyard fled with his wife and daughter from Colorado to Washington, where he easily acquired a lucrative job as a car salesman.

Mr. Panyard and his co-defendants were indicted on twenty-eight counts. Mr. Panyard entered a guilty plea to one count of conspiracy to commit mail fraud, wire fraud and securities fraud in exchange for dismissal of the remaining counts. In the plea agreement, he reserved the right to contest certain sentencing issues, in particular the calculation of loss.

The Pre-sentence Report (PSR) calculated the loss attributable to the offense as $710,760.79. The PSR stated in relevant part that while in Washington, Mr. Panyard earned $25,000 - $56,000 a year, totaling over $270,000 from 1992-1998, and that he supported a young wife and a teenage daughter. Mr. Panyard had no known assets and a personal debt to his mother of $45,000 for legal fees. Due to his impending incarceration, Mr. Panyard lost his managerial job. The PSR concluded that

> [b]ased on the above information, it would be reasonable to
> extrapolate that over time, the defendant's earnings would return to
> his previous [high] levels. Therefore, while his current ability to pay
> restitution . . . is limited, that ability would increase in the future. Of
> course, a sentence to incarceration would essentially negate this
> projected assessment.

PSR at 26. The PSR also concluded Mr. Panyard did not have an ability to pay any restitution. *Id.*

At the sentencing hearing, pursuant to a number of Mr. Panyard's objections, the district court reduced the attributable loss to $550,986.80. Surpassing a $500,000 threshold, this total triggered a ten-point increase in Mr. Panyard's level of offense. U.S.S.G. § 2F1.1(b)(1)(K). The court sentenced him to the top of the guidelines, thirty months incarceration and three years supervised release with detailed conditions of supervision. Contrary to the conclusions in the PSR, the court found Mr. Panyard did have the ability to pay and ordered restitution in the amount of $534,469.60. Aplt. App. at 166.[1]

## 1. Restitution

Mr. Panyard first challenges the district court's assessment of his ability to pay, arguing his record reflects a lack of assets and earning potential. We review the district court's findings of fact underlying a restitution order for clear error and the amount of restitution for abuse of discretion. *See United States v. Copus,* 110 F.3d 1529, 1537 (10th Cir.1997).

In determining a restitution order, the court must consider the financial resources of the defendant, as well as the financial needs and earning ability of the defendant and the defendant's dependents. 18 U.S.C. § 3664(f)(2) (Supp. II

---

[1] Attributable loss for sentencing purposes may include intended and actual losses. U.S.S.G. § 2F1.1 comment. n. 7 (1997). The total can differ from the restitution amount, which would not include intended losses.

1996). We have held that a restitution order should be consistent with the defendant's ability to pay. "A restitution order will be upheld if the evidence indicates a defendant has some assets or earning potential and thus possibly may be able to pay the amount ordered." *United States v. Rogat*, 924 F.2d 983, 985 (10th Cir. 1991). "A sentencing court is not required to make specific findings as to a defendant's ability to pay, provided sufficient information was available to and considered by the court." *United States v. Kunzman*, 54 F.3d 1522, 1532 (10th Cir. 1995). As long as the court follows this standard, even indigency is not a bar to restitution. *Rogat*, 924 F.2d 985.

In his brief, Mr. Panyard relies on *United States v. Haddock*, 50 F.3d 835, 837 (10th Cir. 1995), as favorable precedent. There, however, we found the record insufficient to demonstrate that the sentencing court had adequately considered the defendant's ability to pay. *Id.* at 838-39. By contrast, transcripts and other documents here indicate a thorough record that the court carefully considered. Moreover, the defendant in *Haddock* was serving a sentence of life imprisonment, a far more serious detriment to his long-term earning potential than Mr. Panyard's two and a half year term.

We believe *Kunzman*, 54 F.3d at 1533, is a more apposite case. In *Kunzman*, the defendant was a healthy fifty-five year old man with some college credit. He averaged $48,000 a year as a successful businessman prior to

incarceration. Like Mr. Panyard, the defendant in *Kunzman* supported a wife and a teenage child, and he declared he was bankrupt with minimal assets. He was sentenced to a six-year term. The district court found the defendant in *Kunzman* had the ability to pay and ordered restitution of over $300,000. We affirmed.

The record before us reflects a similar set of facts. The PSR describes Mr. Panyard as a forty-seven year old man with good physical and mental health. He attended at least two years of college and was easily employed. In fact, after fleeing to Washington, he accompanied his friend to buy a car and immediately received a job offer from the car dealership. As a car salesman, he earned up to $56,000 a year. In short, while Mr. Panyard's restitution amount is greater than the defendant's in *Kunzman*, Mr. Panyard is younger, has a shorter sentence, and was able to earn more before incarceration. We conclude, as we did in *Kunzman*, that the district court did not abuse its discretion in determining an ability to pay.

## 2. Attributable Loss

Mr. Panyard next seeks to reduce his offense level by reducing the loss attributable to him. We review the court's determination of monetary loss under U.S.S.G. § 2F1.1 as a factual finding under the clearly erroneous standard, giving due deference to the sentencing court, and we review issues of law de novo. *See United States v. Janusz*, 135 F.3d 1319, 1324-25 (10th Cir. 1998). The sentencing guidelines note the determination of attributable loss "need not be determined

with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G § 2F1.1. comment. n.8 (1997). The guideline gives the court discretion to depart upward when the attributable loss does not "capture the harmfulness and seriousness of the conduct." *Id.* at comment. n. 10. Adopting the spirit of the guidelines, we have said, "the purpose of the loss calculation under the Sentencing Guidelines is to measure the magnitude of the crime at the time it was committed." *Janusz*, 135 F.3d at 1324.

Mr. Panyard contends the court miscalculated loss on three theories of error. We address each issue in turn. First, Mr. Panyard argues that the district court erred in accepting the government's calculation of loss over the victims' written testimony. After reviewing the evidence, the sentencing judge stated: "I have made a factual determination that the most reliable and credible evidence before me today is that schedule submitted by Ms. Chamberlain [the government's witness]. And that I will adhere to." Aplt. App. at 135. Ms. Chamberlain was a certified public accountant who supported her calculations with receipts, amortization schedules, bank deposits and detailed interest analysis. No equivalent evidence supported the victims' calculations. There was no clear error in accepting Ms. Chamberlain's calculations as the more credible.

Second, Mr. Panyard contests the inclusion as victims of those he terms "commercial lenders," asserting these individuals were not deceived and several

were fully collateralized and therefore not exposed to actual loss. After reviewing the record, we are persuaded Mr. Panyard's plea agreement covers liability for the lenders at issue. His plea reads in relevant part:

> There were aspects of the way Pros was run that operated as a fraud and deceit upon the investors and lenders:
>> (1) Pros did not have profits sufficient to repay all principal and interest payments due the investors and lenders who demanded repayment under the notes.

Aplt App. 24. This plea includes Mr. Panyard's responsibility to any lender to Pros, commercial or otherwise. Any argument to the contrary undermines the credit Mr. Panyard was given for acceptance of responsibility.

Alternatively, Mr. Panyard argues that there was no loss on any of the loans which were guaranteed by Ms. Shea's stock of $170,000. He contends the court should have subtracted these collateralized loans from the loss attributed to him, reducing it to under $500,000. The district court recognized, however, that if the collateralized loans were subtracted, then Ms. Shea's pledged stock value must be added. Mr. Panyard's inducement of Ms. Shea's guarantee was clearly one part of his scheme to defraud lenders. No doubt her loss was foreseeable, intended, and actual within 2F1.1. If we subtract the collateralized loans of roughly $170,000, and add back Ms. Shea's stock value of the same amount, Mr. Panyard's loss is unchanged.

Finally, Mr. Panyard argues that the interest on several loans was

miscalculated. He did not raise this issue below. "Normally, failure to alert the trial court to an error precludes review." *United States v. Saucedo,* 950 F.2d 1508, 1511 (10th Cir. 1991). Furthermore, the guidelines require only estimates, not precision. U.S.S.G § 2F1.1. We decline to address the issue further.

We conclude the district court did not err either in setting the amount of restitution or in calculating the attributable loss. Accordingly, we **AFFIRM.**

ENTERED FOR THE COURT

Stephanie K. Seymour
Chief Judge