**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 23 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No. 95-6034

VIRGIL ALLAN COPUS,

    Defendant-Appellant,

---

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CR-94-73-T)

---

Joseph W. Strealy, of Schnetzler/Strealy, Oklahoma City, Oklahoma, for
Defendant-Appellant.

Thomas M. Gannon, Attorney, Department of Justice, Washington, D.C. (Rozia
McKinney-Foster, United States Attorney, and Jerome A. Holmes, Assistant
United States Attorney, Oklahoma City, Oklahoma, with him on the brief), for
Plaintiff-Appellee.

---

Before **SEYMOUR**, Chief Judge, **ANDERSON** and **KELLY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Virgil Allan Copus was convicted of making a false statement to a bank, in violation of 18 U.S.C. § 1014. The district court sentenced him to a term of twenty-four months imprisonment, followed by twenty-four months of supervised release, and ordered him to pay restitution. He appeals his conviction and sentence. We affirm the conviction, but we remand for resentencing.

I.

On April 8, 1987, Mr. Copus executed two notes to the Bank of Hydro (Hydro); one line of credit for $250,000 and one installment note for $50,000. Mr. Copus borrowed the money to finance his farming and ranching activities, and although ostensibly only the smaller loan was to refinance existing debt, most of these funds were immediately used to satisfy existing debt to Hydro and the Bank of Canute. The notes were secured by Mr. Copus' cattle, crops, farm, equipment, and minerals, and ninety percent of their value was guaranteed by the Federal Home Administration (FHA). The federal guarantee required that cattle inspections be performed quarterly, although Hydro officials admitted they performed these inspections only biannually. On several occasions, these inspections were performed by Hydro's vice-president in charge of its office in Eakly, Oklahoma, Randy Hutcherson.

On December 16, 1989, Dale Beerwinkle inspected Mr. Copus' cattle on behalf of Hydro, or at least he thought he did. All parties agree that Mr. Copus guided Mr. Beerwinkle to a herd of roughly 464 head of cattle, valued at $218,969, but the parties dispute how much of that herd belonged to Mr. Copus and what representations Mr. Copus made to Mr. Beerwinkle as to his ownership interest in this livestock. Nonetheless, the first-hand accounts of what transpired at the December 16 cattle inspection are fundamentally consistent.

According to Mr. Beerwinkle, he met Mr. Copus at the latter's house at 8:00 on that Saturday morning. The two drove to look at some exotic bulls, with Mr. Beerwinkle driving his pickup at Mr. Copus' direction.[1] Mr. Copus provided a head count, which Mr. Beerwinkle roughly verified. Mr. Beerwinkle noticed an unusual brand on the bulls' left hip, and Mr. Copus explained that it has a holding brand and that he had a partner who acquired these bulls in other parts of the state.[2] He said they would ship the bulls in, fatten them up on wheat pasture, and

---

[1]Mr. Beerwinkle testified:

> Q.     Did Mr. Copus tell where the cattle were and --
> A.     Yes. We rode together and he showed me.

Rec., vol. III, at 477.

[2]On cross-examination, Mr. Beerwinkle attempted to explain how Mr. Copus explained this:

> Q.     ...[D]id you say he had a -- you thought he had a partner on the bulls, or --

(continued...)

-3-

ship them to sale "to make extra profit." Rec., vol. III, at 457. Mr. Beerwinkle recorded estimates of the bulls' weights. Mr. Copus and Mr. Beerwinkle then drove to several more locations. At each site where Mr. Copus was grazing stock, he told Mr. Beerwinkle how many cattle were there, and Mr. Beerwinkle attempted to confirm the number and estimate their weight. In one case, Mr. Copus thought several head were missing, which Mr. Beerwinkle separately noted. Finally, they returned to Mr. Copus' house, where he had fifteen exotic heifers which Mr. Beerwinkle noted. As they talked, Mr. Copus mentioned he had cattle in another location "on the gain," meaning he was grazing cattle belonging to someone else who would pay him upon sale for any additional weight gain.

Mr. Beerwinkle testified that this was the first and only time Hydro had not given him any records prior to inspection describing the cattle he was to inspect, and he suggested that not having the records may have affected the accuracy of his count. See rec., vol. III, at 476-77. Mr. Beerwinkle testified that Mr. Copus

---

[2](...continued)

    A.     He mentioned having a partner.
    Q.     He mentioned having a partner?
    A.     But he didn't explain it exactly, and perhaps I was at fault
for --
    Q.     No, we're not finding any fault with you, sir.
    A.     Okay.

Rec., vol. III, at 471.

did not say or do anything to indicate he did not own the cattle. On the other hand, Mr. Beerwinkle also testified that he did not believe Mr. Copus ever said he was taking him to see the cattle in which Hydro had an interest. Rather, he said, "That's what I assumed he was showing me." Rec., vol. III, at 472.

After leaving Mr. Copus' house, Mr. Beerwinkle talked to Mr. Hutcherson because he was concerned about assessing the value of the bulls with the holding brands and the exotic breeds. Mr. Hutcherson told him to do the best he could. Within the week, Mr. Beerwinkle prepared a written report for Hydro in which he estimated the value of Mr. Copus' cattle at $218,969, although he later testified that he made errors in his calculations. Mr. Copus did not see the report at that time, and was not apprised of its contents until much later.

Mr. Copus' version of these events accords substantially with Mr. Beerwinkle's. He testified he showed Mr. Beerwinkle bulls that he "had a partner on," rec., vol. IV, at 619, and other cattle that he owned.[3] As he sold cattle

---

[3]Mr. Copus and Steve Bonham evidently had an arrangement to split the profits on some bulls. While this may have given Mr. Copus a property interest in the bulls, he and Mr. Bonham did not have a partnership.

As to the cattle he said he owned, Mr. Copus testified:

> Q. Tell us. Did you own -- or did you and the bank own them?
> A. Yes.
> Q. In other words, they were cattle that were there that you -- that were the bank's cattle?
> A. Yes.

(continued...)

throughout the winter and the spring he deposited all proceeds with Hydro, although he did not necessarily direct that these moneys be used to repay his loans.

Before the line of credit loan matured in April 1990, Mr. Copus and Mr. Hutcherson completed a short-term extension. Such extensions are common with agricultural loans, due to uncertainties of weather, prices, and harvest times. In this case Mr. Copus sought to fatten his cattle more before selling them. On April 8, Mr. Copus signed a financial statement prepared by Mr. Hutcherson which stated that Mr. Copus had 500 cattle worth $270,000, although testimony from Mr. Copus and a bank employee established that Mr. Hutcherson completed the statement and Mr. Copus signed it without reading it. On June 7, Mr. Copus deposited about $62,000 with Hydro and applied to extend the loan again. On June 18, Mr. Copus told Mr. Hutcherson that he had only 43 head of cattle, valued approximately at $30,000.

Bank officials and law enforcement agents testified that during their investigations Mr. Copus confessed he had lied at the December 16 cattle inspection. For example, Lary L. Damron, an FBI agent, testified Mr. Copus "said that he had lied to the bank examiner, that he had represented these cattle as being his cattle in connection with the collateral on the note, and that all of the

[3](...continued)
Rec., vol. IV, at 619.

cattle were not his." Rec., vol. III, at 482. Mr. Copus denied having made such statements and conceded only that he had told the bank he would repay the loan and then could not. Indeed, following liquidation of Mr. Copus' assets, both Hydro and FHA were left with considerable losses. Because Mr. Copus had bought and sold cattle throughout the winter and spring, investigators were unable to determine how many head of cattle Mr. Copus had owned at various times before his June 18 conversation with Mr. Hutcherson.

Mr. Copus was indicted on two counts of making false statements to a bank. The first count charged that he misrepresented his ownership of cattle during the December 16 cattle inspection, while the second count charged that he similarly made misrepresentations in completing the April 8 financial statement. The jury convicted Mr. Copus on the first count. He appealed, maintaining that insufficient evidence supported the jury's verdict. He also contested the district court's application of the sentencing guidelines, and its decision to order restitution.

II

In this case, Mr. Copus was charged with violating 18 U.S.C. § 1014, which provides, in relevant part: "Whoever knowingly makes a false statement . . . for the purpose of influencing . . . any institution . . . upon any application . . . or loan, or any change or extension of any of the same, or the acceptance, release, or substitution of security therefor, shall be fined . . . or imprisoned . . . ." Applying clear precedent in this circuit, the district court instructed the jury without objection that the false statement was material as a matter of law. See United States v. Evans, 42 F.3d 586, 592 (10th Cir. 1994).

We abated this appeal pending our en banc determination in United States v. Wiles, 102 F.3d 1043 (10th Cir. 1996) (en banc), in which we considered the effect of United States v. Gaudin, 115 S. Ct. 2810 (1995), on several bank fraud statutes similar to section 1014. In Gaudin, the Court held that questions of materiality are not purely legal and must be submitted to the jury. The Court did not address whether materiality was an element of the crime because the government had conceded that it was. Id. We held in Wiles that Gaudin must be applied retroactively. See Wiles, 102 F.3d at 1055. Notwithstanding the defendant's failure in Wiles to object to the district court's conclusion that materiality was a question of law for the court, we held that a failure to instruct the jury on an element of the crime is per se reversible "[b]ecause the . . . jur[y] .

-9-

. . . did not render a verdict, formal or otherwise . . . on the element of materiality." Id. at 1060.

Mr. Copus never asserted that the alleged false statement in this case, if made, was not material. Nevertheless, in light of our holding in Wiles, we issued an order and judgment reversing Mr. Copus' conviction because the issue of materiality was not sent to the jury, and remanding for further proceedings. In so doing, we relied on circuit authority holding materiality to be an element of the crime under 18 U.S.C. § 1014. See United States v. Grissom, 44 F.3d 1507, 1510 (10th Cir.), cert. denied, 115 S. Ct. 1720 (1995). We also noted, however, that the Supreme Court had granted certiorari in United States v. Wells, 63 F.3d 745 (8th Cir. 1995), cert. granted, 116 S. Ct. 1540 (1996), to determine whether materiality is in fact an element of the crime under section 1014.

The government filed a petition for rehearing asking us to stay issuance of the mandate and postpone final resolution of this appeal until the Supreme Court ruled in Wells. We granted the request. The Supreme Court issued its opinion in Wells on February 26, 1997, holding that materiality is not an element of a section 1014 offense. See United States v. Wells, 117 S. Ct. 921, 924 (1997). That opinion negates the basis upon which we previously concluded Mr. Copus' conviction must be reversed. We therefore grant rehearing, vacate our order and judgment, and turn to the merits of the remaining issues raised on appeal.

-10-

III

Mr. Copus argues the evidence was insufficient to support his conviction. In reviewing the legal sufficiency of the evidence supporting a criminal conviction, we examine all of the evidence and any reasonable inferences arising from it in the light most favorable to the government and ask whether a rational juror could have found the essential elements of the crime beyond a reasonable doubt. United States v. Grissom, 44 F.3d 1507, 1510 (10th Cir.), cert. denied, 115 S. Ct. 1720 (1995). We do not substitute our judgment for that of the jury. Id.

Under 18 U.S.C. § 1014 as construed in Wells, the jury must have found Mr. Copus made a false statement to a federally insured bank knowing the statement was false and intending to influence the bank. Wells, 1997 WL 78052, at *8. Although there is no direct evidence that Mr. Copus explicitly lied to Mr. Beerwinkle about his interest in the cattle under inspection, direct evidence of an overt lie is not required. "A representation has long been held to consist of words, made orally or in writing, or other conduct manifesting to another the existence of a material present or past fact." United States v. Bonnett, 877 F.2d 1450, 1456 (10th Cir. 1989)(emphasis in original). The jury might have found persuasive the testimony of the various investigators who contended that Mr.

-11-

Copus had admitted to lying. Alternatively, the jury might reasonably have concluded that Mr. Copus, without a discouraging word, led Mr. Beerwinkle to cattle intending to leave him with the impression that he owned more cattle than he actually did. The evidence was sufficient to convict.

IV

Mr. Copus also argues that the district court erred when it sentenced him. He contends the court erroneously calculated the amount of loss he caused, which the court set at $183,149.09, and improperly adjusted his sentence upwards for obstruction of justice and more than minimal planning. On appeal, we accept a district court's factual findings for sentencing unless they are clearly erroneous, and we accord due deference to the lower court's application of the Sentencing Guidelines to the facts. United States v. Markum, 4 F.3d 891, 896-97 (10th Cir. 1993). We consider Mr. Copus' arguments in turn.

A. Amount of Loss

Section 2F1.1 of the guidelines, which governs offenses involving fraud and deceit, provides for an upward adjustment on the basis of the loss attributable to an offense. In determining the amount of loss for the purposes of section

2F1.1, a court should determine the net value of the property taken, allowing for amounts recovered by lending institutions from assets used to secure a loan. See U.S.S.G. § 2F1.1, comment. (n.7(b)); United States v. Smith, 951 F.2d 1164, 1167-69 (10th Cir. 1991). The government bears the burden of proving loss when seeking an enhancement on that basis. United States v. Reddick, 22 F.3d 1504, 1512 (10th Cir. 1994). A reasonable estimate of loss will suffice. See U.S.S.G. § 2F1.1, comment. (n.8); Reddeck, 22 F.3d at 1512.

The present case is atypical in that the false statement occurred after the loans were issued, in the course of the lender's monitoring of the collateral. The Fourth Circuit has articulated a method for applying the Guidelines in this type of case:

> [W]e hold that in the event a bank loan legitimately is obtained by one who subsequently submits a statement that is required in connection with the loan and that statement is false (e.g., defendant falsifies a required periodic report of his current assets), the loss under U.S.S.G. § 2F1.1 is the loss that can be attributed to the false statement. Generally, the loss attributable to the false statement is the amount of the outstanding loan less any amount recouped by the bank from assets pledged against the loan, less the estimated amount the bank would have lost had the statement not been false.

United States v. Wilson, 980 F.2d 259, 262 (4th Cir. 1992); see also United States v. Haddock, 12 F.3d 950, 961 (10th Cir. 1993).

Applying Wilson here, the crucial question is what Hydro would have recovered had it foreclosed following the December 16 inspection. As the record

reveals, the proceedings below were lengthy and involved, and no simple account of Mr. Copus' ranching operations emerged from them. At sentencing, the government presented evidence, based in part on Mr. Copus' own statements, that he owned a considerable number of cattle on December 16, 1989, even though it had successfully proven the opposite at trial in order to obtain a conviction. These positions are, at the least, inconsistent: if Mr. Copus owned the cattle he showed Mr. Beerwinkle, he made no misrepresentation; and if he did not, Hydro could not have eliminated losses by foreclosing earlier. Indeed, because the proceedings were so confused, the district court stated before ruling on the amount of loss that it would "announce a ruling and follow it with a complete explanatory written order for the benefit of counsel, parties, and a reviewing court." Sentencing Hearing Tr. at 897. The court then declared, "I am persuaded that the government position with regard to the loss figures is the more correct and more likely accurate position. There is much to be said about it and authorities to be cited, and I will do that in the written order that I intend to make." Id. at 898.

Unfortunately, the court did not supplement its ruling with a written order. Without any explanation for the determination of loss, we have no alternative but to remand for further proceedings to precisely define the loss and how it was determined.

B. Obstruction of Justice

The Guidelines mandate a two-point upward adjustment if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense. U.S.S.G. § 3C1.1; United States v. Dunnigan 507 U.S. 87 (1993) (holding that findings of perjury require a sentencing adjustment); Markum, 4 F.3d at 898 n.4. Obstruction of justice includes the offering of perjured testimony at trial. U.S.S.G. § 3C1.1 comment. (n.3(b)). However, "[t]he mere fact that a defendant testifies to his or her innocence and is later found guilty by the jury does not automatically warrant a finding of perjury." Markum, 4 F.3d at 897 (noting that "an automatic finding of untruthfulness" would violate a defendant's constitutional rights). Accordingly, we have held that a sentencing court must specifically identify those portions of a defendant's testimony it finds false. United States v. Hansen, 964 F.2d 1017, 1020 (10th Cir. 1992).

The Supreme Court has delineated the procedure to be followed in applying section 3C1.1:

> [I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice, or an attempt to do the same, under the perjury definition we have set out. When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if, as was the case

-15-

here, the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury.

Dunnigan, 507 U.S. at 95 (citations omitted). To establish a defendant's perjury, the court must find that he "(1) when testifying under oath, gives false testimony; (2) concerning a material matter; (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Massey, 48 F.3d 1560, 1573 (10th Cir.), cert. denied, 115 S. Ct. 2628 (1995). "In addition, although Dunnigan did not require sentencing judges specifically to identify the perjurious statement, it has long been a requirement in the Tenth Circuit that the perjurious statement be identified, at least in substance." Id.

In the present case, the district court offered this explanation for its ruling that the adjustment was warranted:

> Finally, with regard to the objection concerning the obstruction of justice, I accept the adjustment as proposed by the probation office. I accept and concur in the government's position that the adjustment is justified.
>
> Again, I tried the case. I heard Mr. Copus's testimony. I also heard the testimony of Special Agent Damron and others. There is no doubt Mr. Copus lied, committed perjury. I was here to here [sic] it. I have no doubt about it. He obstructed justice, and he shall be dealt with accordingly with that adjustment as called for in the--under the applicable authorities.

Sentencing Hearing Tr. 899. As in <u>Massey</u>, the district court failed to identify the specific testimony it found perjurious. Thus, "we are left wholly unable to satisfy our appellate responsibility of review in determining whether the record would support findings of falsity, materiality, and willful intent, even if the district court had made such findings as required by <u>Dunnigan</u>." <u>Massey</u>, 48 F.3d at 1574; <u>see also</u> <u>United States v. Owens</u>, 70 F.3d 1118, 1131-32 (10th Cir. 1995); <u>United States v. Smith</u>, 81 F.3d 915 (10th Cir. 1996).

The government urges that the district court essentially incorporated the arguments submitted in the government's Sentencing Memorandum. However, such incorporation cannot satisfy <u>Dunnigan</u>'s requirement that the court "review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice." <u>Dunnigan</u>, 507 U.S. at 95. Moreover, even the government's submissions fail to identify the allegedly perjurious testimony with the specificity required by <u>Massey</u>. Because the district court failed to make the findings required under <u>Dunnigan</u> and <u>Massey</u>, we remand for it to make further findings. <u>See</u> <u>Massey</u>, 48 F.3d at 1574-75.

## C. Minimal Planning

The Guidelines provide for a two-point adjustment where an offense demonstrated more than minimal planning. U.S.S.G. § 2F1.1(b)(2)(A). This

adjustment may be warranted where (1) there is more planning than is typical for committing the offense in a simple form, (2) significant affirmative steps are taken to conceal the offense, or (3) there are repeated acts over a period of time, unless it is clear that each instance is purely opportune. Id. § 1B1.1, comment. (n.1(f)); United States v. Bridges, 50 F.3d 789, 791 (10th Cir. 1994).

At the sentencing hearing, the government urged that Mr. Copus planned in advance to mislead Mr. Beerwinkle, took Mr. Beerwinkle to several different locations in so doing, and subsequently concealed the misrepresentations. The district court expressly adopted the position of the probation office as outlined in the Pre-Sentence Report. This evidence is sufficient to establish that Mr. Copus' offense involved more planning than a simple form of the offense. Accordingly, we find no error in the district court's imposition of the adjustment for more than minimal planning.

D. Restitution

Mr. Copus also argues the district court erred in ordering him to make restitution. He challenges the court's determinations of his ability to pay and the amount he must pay. The district court's factual findings underlying the restitution order are reviewed under a clearly erroneous standard; the amount of the restitution order is reviewed for abuse of discretion. United States v. Rogat,

924 F.2d 983, 985 (10th Cir.), cert. denied 499 U.S. 982 (1991). The government bears the burden of proving loss when seeking restitution. United States v. Brewer, 983 F.2d 181, 185 (10th Cir.), cert. denied 508 U.S. 913 (1993).

A court must consider a defendant's ability to pay in determining what restitution to grant victims. United States v. Gilbreath, 9 F.3d 85, 86 (10th Cir. 1993), cert. denied 115 S. Ct. 1713 (1995). The court must determine whether the defendant's assets or earning power create an objectively reasonable possibility that the defendant can pay the proposed restitution. United States v. Williams, 996 F.2d 231, 233 (10th Cir. 1993). The defendant bears the burden of showing that he is unable to pay. 18 U.S.C. § 3664(d); United States v. Thompson, 39 F.3d 1103, 1105 (10th Cir. 1994).

The district court found that Mr. Copus could "take advantage of the earning power which he has, his long career in agriculture, and his knowledge and experience to earn beyond his retirement income and make some headway on a restitution figure." Sentencing Hearing Tr. at 902. Calculation of the amount of restitution due is closely related to determination of the amount of the loss incurred. Moreover, the amount of restitution due to the lending institutions here must reflect any payments made by Mr. Copus as a result of civil litigation. For these reasons, we vacate the district court's order of restitution.

We **AFFIRM** the conviction and **REMAND** for further proceedings consistent with our opinion.

95-6034, *United States v. Copus*

Anderson, Circuit Judge, concurring and dissenting in part:


I concur in the majority opinion in this case, with only two exceptions. I respectfully disagree with the majority's reasoning in Part IV.B. with respect to the obstruction of justice adjustment based on the defendant's perjured testimony. The majority concludes that the district court did not make adequate findings as to which testimony was perjured. The defendant's version of the facts at trial was diametrically opposed to statements made by the defendant to law enforcement and other individuals prior to trial. Those individuals testified, and the jury, by its verdict, necessarily concluded that the defendant was untruthful in his testimony.

Given the context, I have no trouble at all understanding what the district court meant when it referred to the testimony of Special Agent Damron and others, finding that in respect to such testimony there is no doubt that the defendant perjured himself. In United States v. Massey, 48 F.3d 1560, 1574 (10th Cir. 1995), we stated that "it is sufficient if [the perjured] testimony is merely described in substance. . . ." That was done here. Remanding for further findings on the issue is, in my opinion, a waste of judicial resources.

Additionally, while I agree with the remand determination in Part IV.A. of the majority opinion, I believe it is unnecessary to rely upon the Fourth Circuit for

the test to be employed in determining actual loss. In <u>United States v. Haddock</u>,

12 F.3d 950, 961 (10th Cir. 1993), we stated:

> Actual loss under section 2F1.1 is "the amount of money the victim has actually ended up losing at the time of sentencing, not what it could have lost." <u>United States v. Kopp</u>, 951 F.2d 521, 531 (3d Cir. 1991). A court should measure actual loss by "how much better off the victim would be but for the defendant's fraud." <u>Id.</u> This measure properly includes all types of losses but does not include those losses that are not attributable to the defendant's fraud. Furthermore, only net loss is considered; anything received from the defendant in return reduces the actual loss. <u>United States v. Smith</u>, 951 F.2d 1164, 1167 (10th Cir. 1991).

I think <u>Haddock</u> adequately covers the situation in the case before us.