FILED
United States Court of Appeals
Tenth Circuit

**March 11, 2014**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

THOMAS B. EVANS,

     Defendant - Appellant.

No. 13-1022

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:11-CR-00481-CMA-1)**

Veronica Rossman, Assistant Federal Public Defender, (Warren R. Williamson, Federal Public Defender, Interim and Virginia L. Grady, Federal Public Defender, Interim, on the briefs), Denver, Colorado, for Defendant - Appellant.

Ellen Meltzer, (Fred G. Medick of Fraud Section, Criminal Division of the United States Department of Justice, Mythili Raman, Acting Assistant Attorney General, and Denis J. McInerney, Acting Deputy Assistant Attorney General, on the brief), Washington, D.C., for Plaintiff - Appellee.

Before **KELLY**, **GORSUCH**, and **HOLMES**, Circuit Judges.

**KELLY**, Circuit Judge.

     Defendant-Appellant Thomas Evans pled guilty to one count of conspiracy

to commit mail and wire fraud, 18 U.S.C. §§ 1349, 1341, 1343, and was

sentenced to 168 months' imprisonment and five years' supervised release. He now appeals his sentence. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Because the district court erred in calculating loss and failing to award an offense level reduction for acceptance of responsibility, we remand for the district court to vacate the sentence and resentence.

Background

Mr. Evans was a property manager and organizer of real estate investment funds, and was owner and president of Evans Real Estate Group, LLC. V R. 212. Between May 2003 and August 2005, Mr. Evans solicited investors for three limited partnerships that would acquire, renovate, and operate low-income apartment complexes in Texas, ultimately selling them at a profit. V R. 213. For example, Garden Stone Apartments, LP, was capitalized utilizing limited partnership interests and certificates (debt) bearing interest at 12% with an expected maturity of seven years. I R. 128, 150. The offering statements contained lengthy disclosure of the substantial risks of these investments: "there is no assurance that the Properties will be operated successfully, that the limited partners will receive a cash return on their investment or that the Certificate Holders will receive interest or principal payments." I R. 164; see also I R. 181, 216 (Ventana Apartments, LP); I R. 231, 258 (Aspen Chase Investments, LP). All told, Mr. Evans raised over $16 million. V R. 215. Mr. Evans, through various

companies, served as general partner of each limited partnership.  I R. 143, 199, 246.

These were legitimate (if highly risky) investment ventures at their outset. V R. 214.  But by April 2005, Mr. Evans experienced cash flow problems and was unable to make the high interest payments to investors.  V R. 452.  He contributed his own funds, but represented that his management company was renting units from the various entities.  Id.  Ultimately, Mr. Evans contributed approximately $4.5 million of his own money to keep the investments solvent.  IV R. 90-91; V R. 452.  He also commingled funds of the ventures, using funds from each offering to pay operational expenses of others.  V R. 213-14.  He changed some of the income and decreased some of the expenses reported by the entities.  V R. 214, 452.  This was accomplished, at least in part, by false journal entries in an electronic accounting system that generated monthly financial statements; once the statements were generated, the entries were corrected.  The statements would reflect greater gross potential rent, rental income and occupancy rates, lower vacancy and delinquency rates, and fewer renewal concessions.  The false reports were provided to investors, lending institutions, and others.  V R. 214.

Mr. Evans' activities continued until April 2007, when he was removed as property manager and an appointed receiver took control of the projects.  V R. 213, 214.  In September 2007, the receiver recommended that one of the remaining properties be abandoned to foreclosure, but believed that two others

retained value and could be salvaged with additional investment. I R. 470-71. At the receiver's behest, Mr. Evans' investors, although not required to, invested an additional $3 million. V R. 215.

By April 2009 the receiver had improved the properties, but encountered unforeseen construction costs and difficulties associated with the nation-wide financial crisis. I R. 496-97. By September, the value of the properties dropped significantly, and the receiver allowed the remaining properties to fall into foreclosure. I R. 523.

Mr. Evans pled guilty by written agreement to an information charging him with one count of conspiracy to commit mail and wire fraud. I R. 31. In the plea agreement the government asserted that Mr. Evans' fraud caused his investors to lose $9.7 million, but Mr. Evans disputed the government's loss calculation and reserved the right to challenge it. I R. 38. The government later increased its loss estimate to approximately $12 million. I R. 76. The parties agreed that the applicable Guidelines chapter was § 2B1.1, but made no other agreements related to sentencing. I R. 38. At Mr. Evans' change of plea hearing, however, the government confirmed that it was agreeing to a full three-level decrease in offense level for acceptance of responsibility. IV R. 14.

Two months before the sentencing hearing, Mr. Evans filed a motion to continue his sentencing to allow newly appointed counsel to review the considerable discovery in his case. I R. 67-71. In his motion Mr. Evans argued

that the government's loss calculation methodology—subtracting the amount returned to his investors from the amount initially invested—was incorrect, and that the court must determine the amount of loss reasonably foreseeable to him. I R. 68. This calculation, Mr. Evans asserted, must account for the impact of extrinsic factors such as the actions of the receiver and market conditions on the investors' loss. I R. 69-70. Counsel sought more time to investigate those factors. Id.

The district court denied the motion, finding that "the fruits of such investigation would be irrelevant to determining the 'actual loss' suffered by the investors." I R. 88-89. The court relied on United States v. Turk, 626 F.3d 743 (2d Cir. 2010), in stating that even if extrinsic factors were partially responsible for the eventual bankruptcies of the properties, the only loss that needed to be foreseeable to Mr. Evans was the loss of the "unpaid principal." I R. 90. Thus, the court held that the proper loss calculation was the amount of the initial investment less any return to the investors, and that the loss was foreseeable to Mr. Evans. I R. 91.

Mr. Evans filed a sentencing memorandum again challenging the government's loss calculation. I R. 105-26. He argued that there was no causal link between the criminal conduct and the investors' losses, and thus no "actual loss." I R. 121, 124. In response, the government insisted Mr. Evans should receive no reduction for acceptance of responsibility, I R. 544-47, and did not file

a request for a one-level reduction under § 3E1.1(b) as it previously represented it would, IV R. 165.

At the sentencing hearing, the district court adopted the government's loss calculation and its prior holding that any extrinsic factors did not need to be foreseeable to Mr. Evans. IV R. 110-12. The court found irrelevant the fact that there was no fraud in the inducement of the investments. IV R. 112-13. The court granted a two-level reduction in offense level for acceptance of responsibility under § 3E1.1(a), but upheld the government's refusal to request a third point under § 3E1.1(b). IV R. 129. The court sentenced Mr. Evans to 168 months' imprisonment with five years' supervised release, and ordered restitution in the amount of actual loss. IV R. 166, 169. This appeal followed.

## Discussion

Mr. Evans challenges the district court's loss calculation methodology and its failure to award him a third one-level acceptance of responsibility reduction. Because we find the district court erred on both points and remand for resentencing, we need not address Mr. Evans' other arguments regarding the restitution order and the substantive reasonableness of his sentence.

A.    Loss Calculation

Mr. Evans argues that the district court erred in calculating actual loss by (1) failing to account for the fact that there was no fraud in the inducement of the

investments, (2) disregarding the foreseeability and effect of the actions of the receiver and market conditions on actual loss, and (3) refusing to reduce actual loss by the $4.5 million that he personally infused into the partnerships. We review the district court's loss calculation methodology de novo and its factual finding of loss for clear error. United States v. Gordon, 710 F.3d 1124, 1161 (10th Cir. 2013).

U.S. Sentencing Guidelines Manual § 2B1.1(b)(1) provides sentencing enhancements for fraud based on the amount of loss caused by the criminal conduct. Section 2B1.1 cmt. n.3(A) defines actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i) (2013). Reasonably foreseeable pecuniary harm is monetary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id. at cmt. n.3(A)(iv). Thus, § 2B1.1 incorporates and requires both factual or "but for" causation and legal or foreseeable causation. Id. at App. C Vol. II Amend. 617, at 178.

Mr. Evans argues that the district court erred in calculating loss because there was no fraud in the inducement of the investments. Aplt. Br. 34-38. He is correct. In calculating loss, the district court started with the amount initially invested and subtracted the amount returned to the investors. IV R. 108. Although it acknowledged that there was no fraud in the inducement, the court thought it irrelevant because Mr. Evans' fraud encouraged the investors not to

raise questions or pull their investments.  IV R. 112-13.  That may have been the effect of the fraud, but the court should have accounted for the fact that between May 2003 and April 2005 there was no criminal conduct.  Any decrease in the value of the properties during that time period cannot constitute "harm that resulted from the offense."  U.S.S.G. § 2B1.1 cmt. n.3(A)(i).

In United States v. Copus, we examined actual loss in the case of loan fraud where "the false statement occurred after the loans were issued, in the course of the lender's monitoring of the collateral." 110 F.3d 1529, 1535 (10th Cir. 1997). We said that "the loss attributable to the false statement is the amount of the outstanding loan less any amount recouped by the bank from assets pledged against the loan, *less the estimated amount the bank would have lost had the statement not been false*."  Id. (quoting United States v. Wilson, 980 F.2d 259, 262 (4th Cir.1992)) (emphasis added).  Thus, the district court should have inquired into what loss, if any, the investors would have suffered if Mr. Evans had come clean regarding the status of the securities (and the underlying properties) in April 2005.  This requires a determination of the value of the securities at the time the fraud began, which is the correct starting point for loss calculation in this case.  In making that calculation, the fact that the securities had lost value due to a poor or unsustainable business model would not be chargeable to Mr. Evans.

Next, Mr. Evans argues that the district court should have considered the

effect and foreseeability of non-fraud factors in determining loss. Aplt. Br. 38-41. Again, he is correct.

The district court relied on United States v. Turk, 626 F.3d 743 (2d Cir. 2010) in stating that the receiver's actions and market conditions were irrelevant to determining actual loss. That reliance was misplaced. In Turk, the defendant made false promises to obtain loans for real estate projects and promised that the loans would be collateralized by recorded first mortgages. Id. at 745. Ms. Turk was arrested, defaulted on the loans, and her company was forced into bankruptcy. Id. at 745-46. When the buildings were liquidated, the proceeds were insufficient to repay her investors, who had no collateralized position. See id. at 746. The Second Circuit rejected Ms. Turk's argument that actual loss should be zero because the buildings purportedly securing the loans retained some value at the time her fraud was discovered, and were only later devalued by extrinsic forces such as the financial crisis. See id. at 748. In other words, had the housing market not crashed, her victims' losses would have been recouped. The Turk court stated, "[T]he victims' *loss* was the unpaid principal, and we hold that the decline in value in any purported collateral need not have been foreseeable to Woolf Turk in order for her to be held accountable for that entire loss." Id. at 749.

We expressly adopted Turk in United States v. Crowe, 735 F.3d 1229 (10th Cir. 2013). The defendant in Crowe fraudulently obtained mortgage loans and

eventually defaulted. Id. at 1232-33. Like Ms. Turk, Ms. Crowe argued that "the difference between the outstanding loan amount and the foreclosure proceeds" was not reasonably foreseeable because Ms. Crowe could not have anticipated the financial crisis. Id. at 1236. We held that "the concept of reasonable foreseeability applies only to a district court's calculation of 'actual loss,' and not to its calculation of the 'credits against loss' [under U.S.S.G. § 2B1.1 cmt. n.(3)(E).]" Id. at 1241. Section 2B1.1 cmt. n.(3)(E)(ii) provides that "[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral" should be deducted from loss. Under the plain language of the Guidelines, and under Crowe, credits against loss do not need to be foreseeable. Since the loss in Turk and Crowe was simply the outstanding loan balance, and the underlying buildings were only collateral, the decline in value of the real estate in these cases did not need to be foreseeable.

But unlike the schemes in Turk and Crowe, Mr. Evans' is not garden-variety mortgage fraud. Here, the real estate projects were not mere "insulation against loss," Turk, 626 F.3d at 751; they were the underlying assets of the limited partnerships. The value of the limited partnership interests and certificates held by Mr. Evans' investors was tied to the health of the ventures, the economy, and what might be received on sale or foreclosure of the properties. In this way, the investors' interests were akin to equity. The court in Turk

- 10 -

distinguished simple debt from equity, noting that an equity security "is owned outright, with the assumption of upside benefit and downside risk, while a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit." Id. Whereas the investors in Turk and Crowe were simply promised loan payments, Mr. Evans' investors purchased securities whose value necessarily fluctuated. The victims were not guaranteed *any* return, and were aware that the success of their investment hinged on unpredictable factors, including the economy. I R. 139, 164-65. Though the certificate holders were promised eventual repayment, they were also promised extraordinary returns predicated on the success of the underlying properties, with disclosure of the associated and substantial risk factors. Accordingly, the "two-step" loss calculation described in the mortgage fraud cases, which distinguishes between "the initial calculation of loss (where foreseeability is a consideration) [and] the credits against loss available at sentencing (where it is not)," Turk, 626 F.3d at 751, is not appropriate here. Instead, this case calls for a single, more complex inquiry: the reasonably foreseeable amount of loss to the value of the securities caused by Mr. Evans' fraud, disregarding any loss that occurred before the fraud began, and accounting for the forces that acted on the securities after the fraud ended.

On remand, the district court must determine whether Mr. Evans' fraud was a "but for" cause of the investors' loss, and whether it was the legal cause. In

considering the latter, the court must account for the effect and foreseeability of non-fraud factors including the actions of the receiver to prolong the investments and the effect of the housing market on the value of the securities and the underlying properties. The district court should determine in the first instance the proper assignment of the burden of production regarding these non-fraud factors. See Gordon, 710 F.3d at 1163 n.40.

Mr. Evans also argues that loss should have been reduced by the $4.5 million he personally infused into the partnerships, asserting they were "services rendered" to his investors, but we reject that argument. U.S.S.G. § 2B1.1 cmt. n.3(E)(i) provides that loss shall be reduced by the value of "the services rendered . . . by the defendant . . . to the victim before the offense was detected." The district court refused to credit the $4.5 million because it was not returned to the investors, but instead used "to cover up the business losses or to cover the business losses." IV R. 115. Mr. Evans argues that the $4.5 million was "services rendered" because it was used to operate the partnerships. The Second Circuit rejected a similar argument in United States v. Byors, in which a business owner who lied about assets securing his victims' loans argued that money used to capitalize his business and pay for legitimate expenses should be credited against loss as "services rendered" to the victims. 586 F.3d 222, 226 (2d Cir. 2009). The court held that these were not "services rendered" because they conferred no benefit or return on investment to the victims. Id. In this case, the

district court's finding that the funds Mr. Evans put into the partnerships provided no ultimate benefit to the investors and prolonged the fraud is not clearly erroneous.  As such, the $4.5 million should not be credited against loss.

B.      Acceptance of Responsibility

Mr. Evans argues that the district court erred in refusing to award him a one-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(b).  Under § 3E1.1, a defendant's offense level may be reduced by up to three levels.  A defendant will receive a two-level reduction under § 3E1.1(a) if he clearly demonstrates acceptance of responsibility.  Id. at § 3E1.1(a).  A defendant will receive an additional one-level reduction under § 3E1.1(b) only "upon motion of the government" stating that the timeliness of his notification to plead guilty permitted the government and court to allocate resources efficiently.  Id. at § 3E1.1(b).  The government has "broad" but "not unfettered" discretion whether to file a § 3E1.1(b) motion.  United States v. Naramor, 726 F.3d 1160, 1166 (10th Cir. 2013).  The district court may reject the government's refusal if it was "(1) animated by an unconstitutional motive, or (2) not rationally related to a legitimate government end."  United States v. Moreno-Trevino, 432 F.3d 1181, 1186 (10th Cir. 2005).  We review the district court's decision to accept or reject the government's refusal to file a § 3E1.1(b) motion for clear error.  Naramor, 726 F.3d at 1166.

On the record before us, the government's decision to reverse its stated

course and refuse to request an acceptance of responsibility reduction is not rationally related to any legitimate government end. The district court held that the government's refusal was related to efficiency and resource allocation, IV R. 129, but we cannot see how, given that the government acknowledged Mr. Evans's right to challenge loss, I R. 38, and expressly agreed to request a third point under § 3E1.1(b) with knowledge of that right, IV R. 14. The government did not assert in the district court that its refusal was grounded in concerns for resource allocation; it argued only that Mr. Evans had not truly accepted responsibility. See I R. 530-31, 544-47; IV R. 117-25. Here, it explains that "the government declined to move for a reduction under § 3E1.1(b) because of Evans's denial that he was responsible for any loss to the investors." Aplee. Br. 40. The district court necessarily rejected that argument in finding that a two-level reduction under § 3E1.1(a) was appropriate, and noted that Mr. Evans saved the government and the taxpayer significant time and resources by pleading guilty and waiving indictment. IV R. 125.

Considering the above, we find that the government's refusal was not rationally related to resource allocation. Nor do we find Mr. Evans' arguments regarding the foreseeability of loss inconsistent with acceptance of responsibility. We therefore conclude that the district court committed clear error in accepting the government's refusal to request a third one-level reduction under § 3E1.1(b), and that Mr. Evans is entitled to a three-level reduction for acceptance of

responsibility.

For these reasons, we REMAND with instructions to vacate the sentence and resentence consistent with this opinion.