**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 3, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

THOMAS B. EVANS,

      Defendant - Appellant.

No. 15-1461
(D.C. No. 1:11-CR-00481-CMA-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH** and **O'BRIEN**, Circuit Judges.[**]
_____

This is the second appeal of a sentence imposed after Mr. Evans

pleaded guilty to conspiracy to commit mail and wire fraud. _See_ 18 U.S.C.

§§ 1341, 1343, 1349. In the first appeal, we required the district court to

recalculate the losses caused by the fraud and reconsider how the amount

---

[*]    This order and judgment does not constitute binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. But the order and judgment may be cited for its persuasive value under Fed. R. App. P. 32.1(a) and Tenth Cir. R. 32.1(A).

[**]    The Honorable Neil Gorsuch heard oral argument but did not participate in this order and judgment. The practice of this court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal. _See_ 28 U.S.C. § 46(d); _see also United States v. Wiles_, 106 F.3d 1516, 1516, at n* (10th Cir. 1997) (noting that this court allows remaining panel judges to act as a quorum to resolve an appeal).

of the losses would affect the sentence. On remand, the district court recalculated the losses at slightly over $4 million and resentenced Mr. Evans to prison for 10 years and 1 month. We must ask if the district court properly

- recalculated the losses caused by Mr. Evans's fraud and applied a sentence enhancement for the amount of loss,

- applied a sentence enhancement for the number of victims, and

- recalculated the amount of restitution.

We conclude that the court erred in recalculating the losses and restitution and in applying the sentence enhancements.

**1.    Mr. Evans committed fraud through his real estate development firm.**

Mr. Evans was the owner and president of a real estate development firm. Through the firm, Mr. Evans purchased, renovated, and operated apartment complexes, with the ultimate goal to sell them at a profit.

To finance this project, Mr. Evans sold interests in three limited partnerships. At the outset, these three investment ventures were legitimate, but risky. The investors were promised immediate, high interest payments, but were also warned of the investment risks.

By April 2005, the ventures were experiencing cash-flow problems. To keep the ventures afloat, Mr. Evans contributed roughly $4.5 million of his own money, commingled funds, and provided false reports to investors and lenders.

When the fraud was discovered in April 2007, the court appointed a receiver. Upon the receiver's recommendation, the investors contributed more money in an attempt to salvage the business. This attempt proved unsuccessful, however, and the apartment complexes were lost through foreclosure.

**2.    Mr. Evans's original sentence was overturned on appeal.**

Mr. Evans was originally sentenced to 14 years' imprisonment and ordered to pay over $12.3 million in restitution. In sentencing Mr. Evans, the district court applied 2 sentence enhancements under the U.S. Sentencing Guidelines.

The first was a 20-level increase under U.S.S.G. § 2B1.1(b)(1)(K) for the amount of loss caused by the fraud. The court calculated the loss by starting with the total invested and subtracting the amount returned to the investors. Using this calculation, the court found that the investors had sustained approximately $12.3 million in losses.

Second, the district court found that there had been 77 to 92 victims, which resulted in a 4-level increase under U.S.S.G. § 2B1.1(b)(2)(B) because the offense involved 50-249 victims.

Mr. Evans appealed the sentence and we remanded for resentencing, holding that the district court had erred in calculating the loss. On remand, the district court recalculated the loss at slightly over $4 million. Based on this loss, the court applied an 18-level increase under the sentencing

guidelines. U.S.S.G. § 2B1.1(b)(1)(J) (2012). In addition, the court again applied the 4-level increase for an offense involving 50 to 249 victims. U.S.S.G. § 2B1.1(b)(2)(B) (2012). Ultimately, Mr. Evans was resentenced to prison for 10 years and 1 month and ordered to pay slightly more than $4 million in restitution.

Mr. Evans appeals the new sentence.

**3.      Our opinion in *Evans I* established the law of the case.**

In reviewing the district court's method of calculating loss, we are guided by our opinion in Mr. Evans's prior appeal: *United States v. Evans (Evans I)*, 744 F.3d 1192 (10th Cir. 2014). This opinion established the law of the case.

When a case is appealed and remanded, our opinion ordinarily establishes the law of the case. *United States v. West*, 646 F.3d 745, 746 (10th Cir. 2011). As the law of the case, our opinion must generally be followed in subsequent proceedings. *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir. 1998).

The government argues that *Evans I* did not establish the law of the case, theorizing that the resentencing proceedings included new evidence that cast doubt on *Evans I*'s instructions on calculating the loss. We address this argument de novo. *Stewart v. Beach*, 701 F.3d 1322, 1329 (10th Cir. 2012).

4

In applying de novo review, we deviate from the law of the case doctrine only in "exceptionally narrow circumstances;" one is when the evidence in a later proceeding is substantially different from the evidence in the first proceeding. *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir. 1998).

According to the government, this exception applies because the new evidence showed the impossibility of doing what we had required in *Evans I* because of the

- general difficulty in appraising the real estate securities and the nature of the investments,

- large magnitude of the fraud, and

- lack of data on the securities' value when the fraud began.

For these matters, however, the government has not identified any new evidence significantly different from the evidence in *Evans I*.

If the evidence on remand showed difficulty in appraising the securities, this difficulty would also have been apparent from the evidence in *Evans I*, for the nature of the securities and the investment was apparent from the outset. *See Evans I*, 744 F.3d at 1194 (detailing the ventures); *see also* Transcript of Sentencing Hearing at 8-18, *United States v. Evans*, No. 11-cr-00481-CMA (D. Colo. Jan. 15, 2013), ECF No. 96 (testimony at original sentencing hearing describing the investment scheme). The

5

government does not point to any new evidence related to the nature of the securities or the investment scheme.

On the magnitude of the fraud, the government points to testimony that the fraud impeded appraisal of the investment properties in late 2006 and in 2007. But this testimony resembles the evidence in *Evans I*. *See Evans I*, 744 F.3d at 1194.

The government also argues that because of the fraud's magnitude, it was impossible to determine the property values when the fraud began (April 2005). The cited testimony does not support this argument; this testimony addresses only the property values in late 2006 and in 2007, after the fraud had already begun.

Finally, the government argues that *Evans I* does not control because the resentencing proceedings established a lack of data on the property values in April 2005. This is a failure in the government's proof, not a reason to deviate from *Evans I*. The government bears the burden of proof for all sentence increases, and the government's inability to prove the April 2005 property values does not vitiate the remand instructions in *Evans I*. *See United States v. Kirk*, 894 F.2d 1162, 1164 (10th Cir. 1990).

In our view, *Evans I* established the law of the case.

**4. The district court's loss-calculation method did not comply with *Evans I* and was unsupported.**

The resulting question is whether the district court's loss-calculation method complied with *Evans I*. We decide this question under de novo review. *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1256 (10th Cir. 2016). In our view, the loss-calculation method deviated from *Evans I* and was unsupported.

In *Evans I*, we ordered vacatur of the original sentence based on the district court's miscalculation of the loss. *Evans I*, 744 F.3d at 1194. In light of this miscalculation, we instructed the district court to determine "the reasonably foreseeable amount of loss to the value of the securities caused by Mr. Evans' fraud." *Id.* at 1198.

To make that determination, the court was to "disregard[] any loss that occurred before the fraud began[] and account[] for the forces that acted on the securities after the fraud ended." *Id.* To exclude harm preceding the fraud, the district court had to determine "the value of the securities at the time the fraud began." *Id.* at 1196.

The district court initially acknowledged that to recalculate the loss, it was necessary to determine the value of the securities when the fraud began. But during the resentencing proceedings, the court stated that this value could not be determined. R. vol. 6, at 32; *see also id.* at 99 (district court stating that "it is not possible to calculate the market value of the

7

properties at the beginning of the fraud"). The government similarly admitted that it could not prove the value of the securities when the fraud had begun. R. vol. 2, at 1577 (noting that Mr. Evans "began his criminal activity at a point when the investment properties had an indeterminate value"); *id.* at 1585-86 ("[T]he specific data points to which the Tenth Circuit instructed this Court to look in arriving at a loss calculation are not currently part of the evidentiary record . . . and do not appear . . . to be available to the United States.").

In light of these evidentiary difficulties, the district court recalculated the loss through a "loss of equity" theory. None of the parties had endorsed this theory, and it differed from the formula adopted in *Evans I*.

Under this new theory, the court found that Mr. Evans's fraudulent scheme had caused creditors to assert approximately $4 million in liens. The court reasoned that the liens had "increased the total debt burden on the property," reducing the investors' equity. R. vol. 6, at 108. "This [$4 million] loss to the victims," the court concluded, "would not have occurred but for [Mr. Evans's] fraudulent conduct" and was reasonably foreseeable to Mr. Evans. *Id.*

Mr. Evans argues that this recalculation of loss did not comply with *Evans I*. We agree. Under *Evans I*, recalculation of the loss required a determination of the value of the securities when the fraud began. *See*

8

*Evans I*, 744 F.3d at 1196-97 ("This [(determining loss)] requires a determination of the value of the securities at the time the fraud began, which is the correct starting point for the loss calculation in this case.").

The government bore the burden of meeting *Evans I*'s loss-calculation requirements. *See Kirk*, 894 F.2d at 1164. Both the government and the district court acknowledged that the government could not meet its burden under *Evans I*. As a result, the district court erred in applying a loss enhancement to Mr. Evans's sentence.

The government argues that *Evans I* did not require a determination of the value of the investment properties at the beginning of the fraud. According to the government, *Evans I* required only a reasonable estimate of the loss caused by Mr. Evans's fraud. The government contends that a reasonable estimate was feasible based on "the encumbrances placed on [the properties] during the fraud period." Appellee's Resp. Br. at 32. This contention ignores *Evans I*'s instruction to determine the value of the securities when the fraud began. *Evans I*, 744 F.3d at 1196.

The government attempts to square the "loss of equity" theory with the language of *Evans I*, pointing to *Evans I*'s statement that "the investors' interests were akin to equity." *Id*. at 1197. But the *Evans I* court used this statement only to explain why the district court needed to account for non-fraud factors when calculating the loss. *Id*. That statement did not alter our instructions to the district court on remand.

9

But even if the government's interpretation were correct, the district court's "loss of equity" theory did not reasonably measure loss caused by the fraud. The government acknowledged that at least some of the liens "appear to have resulted from activities outside the scope of [Mr.] Evans' fraud." R. vol. 2 at 1724-25. And the government has not identified evidence demonstrating that the liens resulted from fraud, as opposed to a defective business model. *See Evans I*, 744 F.3d at 1197 (stating that a loss in value "due to a poor or unsustainable business model would not be chargeable to Mr. Evans").

When the fraud began in April 2005, the ventures were already experiencing cash-flow problems; indeed, those cash-flow problems are what prompted Mr. Evans to engage in the fraud. The government has not presented any reason to believe that the liens would have been avoided if Mr. Evans had disclosed the cash-flow problems.

In sum, the district court's loss calculation did not follow *Evans I* or reasonably measure the loss caused by the fraud. Thus, the district court erred in applying the loss enhancement.

**5. The district court erred in applying a number-of-victims enhancement.**

The district court also increased Mr. Evans's offense level by 4 levels based on the existence of 50-249 victims. U.S.S.G. § 2B1.1(b)(2)(B) (2012). A victim is "any person who sustained any part of the actual loss determined under subsection (b)(1)." *Id.* cmt. n.1. Pointing to the erroneous calculation of loss, Mr. Evans argues that the error tainted the court's calculation of the number of victims. We agree.

We review the legal conclusions de novo and the factual findings for clear error. *United States v. Leach*, 417 F.3d 1099, 1106 (10th Cir. 2005).

Applying these standards, we conclude that the district court erred in applying the number-of-victims enhancement. As discussed above, the government failed to prove an actual loss under U.S.S.G. § 2B1.1(b)(1). Without an actual loss, there could be no victims. *See id.* at 1107 (holding that the district court erred by applying the number-of-victims enhancement without an actual loss). Thus, the court could not apply the enhancement for the number of victims.

The government states that Mr. Evans "arguably has waived" an appeal of the number-of-victims enhancement by failing to challenge the enhancement in the first sentencing appeal. Appellee's Resp. Br. at 37. We disagree.

11

On remand, the district court expressly reconsidered its decision to apply an enhancement for the number of victims. R. vol. 6, at 84-85. In light of the district court's reexamination of the issue, it would not have mattered if Mr. Evans had appealed the issue at the initial sentencing. The court made a new finding when applying the enhancement again after the remand. Accordingly, Mr. Evans did not waive his challenge to the number-of-victims enhancement.

**6.     The sentencing errors were not harmless.**

The government argues that even if the district court had erred in applying enhancements, the errors would have been harmless. We disagree.

Errors are harmless if they did not affect the sentence imposed. *United States v. Lente*, 647 F.3d 1021, 1037-38 (10th Cir. 2011). As the beneficiary of the errors, the government must prove harmlessness by a preponderance of the evidence. *Id.* at 1037.

In urging harmlessness, the government relies on the court's statement that the sentence would have been the same even without the disputed enhancements.[1] The court explained that even if the guideline range had been lower, a sentence below ten years and one month would have been insufficient. We reject the government's harmless-error

---

[1]     Without enhancements for the amount of loss and number of victims, the guideline range would have been 4 to 10 months. Thus, the district court's statement reflects a decision to imprison Mr. Evans for over 9 years longer than the top of his guideline range.

12

argument because the district court's alternative rationale for the sentence was based on a clearly erroneous finding.

We review the alternative rationale for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). An abuse of discretion occurs when a sentence is based on a clearly erroneous finding. *Id*.

For its alternative sentencing rationale, the district court repeatedly found that Mr. Evans had stolen investors' funds. R. vol. 6, at 124 ("You lied to your victims, you stole their funds, and you failed to manage the investment properties in the manner you promised."); *id*. at 128 (district court expressing regret that it could not find Mr. Evans responsible for "the full $12 million he stole from [investors]"). This finding was clearly erroneous, for there is no evidence that Mr. Evans stole money from investors. To the contrary, Mr. Evans contributed approximately $4.5 million of his own money to keep the business afloat.

Mr. Evans's misrepresentations could conceivably represent a form of "stealing" if the misrepresentations had caused investors to lose money. But as already discussed, the government has been unable to prove loss to investors caused by the fraud. *See* Part 4, above.

The court's clearly erroneous finding could have tainted the alternative rationale for the sentence. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("When a reviewing court concludes that a district court based a departure on both valid and invalid factors, a remand is required

13

unless it determines the district court would have imposed the same sentence absent reliance on the invalid factors."). Thus, we do not regard the erroneous enhancements as harmless. *See United States v. Peña-Hermosillo*, 522 F.3d 1108, 1117-18 (10th Cir. 2008) (holding that an alternative sentencing rationale could not render a procedural error harmless because the alternative rationale was also erroneous).

**7.     We vacate the restitution order.**

In light of the calculation of loss, the district court ordered restitution for slightly over $4 million. The restitution order was also erroneous.

"We review the restitution order for an abuse of discretion, which requires us to review factual findings for clear error and application of the [governing law] de novo." *United States v. Howard*, 784 F.3d 745, 750 (10th Cir. 2015).

We apply this standard against the backdrop of the Mandatory Victims Recovery Act. The Act requires payment of restitution by defendants convicted of "any offense [against property] committed by fraud or deceit." 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii), 3664(f)(1)(A). The amount must be proven by a preponderance of the evidence. *United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008); *see* 18 U.S.C. § 3664(e).

The government has not proven how much loss, if any, resulted from Mr. Evans's fraud. Even if the government had limited information, the court had to base the restitution order on the amount of the actual loss. *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir. 2007). Here, the restitution order was not based on "a reasonable estimate of . . . loss." *Gallant*, 537 F.3d at 1252. As a result, the court erred in calculating restitution.

**8.    We remand for assignment to a different judge.**

Finally, Mr. Evans asks for reassignment to a different judge. We grant this request.

We have an inherent power to remand cases for reassignment to different judges. *O'Rourke v. City of Norman*, 875 F.2d 1465, 1475 (10th Cir. 1989). We rarely exercise this power "absent proof of personal bias." *Id.* But "it is not solely the reality of actual bias or prejudice but also the appearance of impropriety that we must guard against." *Mitchell v. Maynard*, 80 F.3d 1433, 1450 (10th Cir. 1996).

There is no reason to believe that the district judge harbored a personal bias. In the absence of a bias, we use a three-part test to analyze the necessity of reassignment:

> (1)    whether the original judge would reasonably be expected on remand to incur substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected,

15

> (2) whether reassignment is advisable to preserve the appearance of justice, and
>
> (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* (quotation reformatted). Under this test, reassignment is warranted.

First, the district judge repeatedly stated that Mr. Evans deserved a sentence enhancement, saying that it was unfortunate that the loss computation was not higher. R. vol. 5, at 209-10 (district judge stating, before hearing the evidence on the amount of loss, that she would not sentence Mr. Evans within a guideline range resulting from no loss or victim enhancements); R. vol. 6, at 28, 29, 33, 36, 103, 105, 109, 125, 128 (statements that the inability to find a higher loss was unfortunate). The judge added that she believed Americans "do not take white collar crime seriously enough." R. vol. 5, at 174.

Even after we rejected the original loss calculation, the district judge reiterated her belief that Mr. Evans had "stole[n]" approximately $12 million and expressed regret concerning the inability to order restitution in that amount. R. vol. 6, at 128. Thus, we could reasonably expect our disposition to cause difficulty on remand.

Second, reassignment would preserve the appearance of justice. The district judge has already sentenced Mr. Evans twice, and our remand will result in Mr. Evans's third sentencing proceeding for the same offense.

16

Assignment to a different judge would "prevent any . . . appearance of impropriety" in sentencing Mr. Evans a third time. *Mitchell*, 80 F.3d at 1450.

Finally, the government argues that reassignment would waste judicial resources. We appreciate the time that the district judge has spent studying this case, but we are remanding with instructions not to apply an enhancement for loss or the number of victims. Our remand instructions will lessen the resources required to resentence Mr. Evans, and the inevitable duplication of effort from reassignment is necessary to preserve the appearance of fairness.

In light of the history of the case, reassignment is warranted. We are not suggesting that the district judge is personally biased or acted improperly. We merely conclude that reassignment would best serve the interest of justice.

**9.    Disposition**

We remand for the district court to (1) vacate Mr. Evans's sentence, (2) resentence Mr. Evans without applying enhancements for loss (U.S.S.G. § 2B1.1(a)) or the number of victims (U.S.S.G. § 2B1.1(b)), and (3) vacate

the restitution order. On remand, this case must be reassigned to a different judge.

Entered for the Court

Robert E. Bacharach
Circuit Judge

Case No. 15-1461, *United States v. Evans*
**O'BRIEN**, J., specially concurring.

Dating back to 1993 Evans enjoyed success in the real estate business. Seeking to capitalize on past success, in 2003 he decided to pursue an ambitious project—buying and refurbishing tired properties and then turning them at a profit. To do so he needed investors. He adequately disclosed the risky nature of the projects to the investors and, to sweeten the deal, offered 12% per annum interest on invested funds. That debt burden, along with other factors, produced disastrous results.

By April 2005, several things became clear: The rehabilitation costs were considerably more than anticipated, the projects were undercapitalized and the interest obligations to investors were disastrously large and unrelenting. As a consequence, the project took on a gloomy countenance, revealing the business model to have been, at best, overly ambitious or, more likely, inherently flawed. None of that, as all agree, amounted to fraud.

Evans was loath to admit the failure of his projects. He confidently thought he could turn things around and, to that end, poured about $4,500,000 of his own funds into them, and manipulated available cash to put out increasingly violent economic fires. But he did not tell the investors. Instead he put a wholesome spin on seriously bad circumstances. While he did so, in part, with the hope of recovery, he intended to mislead them. The true state of affairs came to light in April 2007. As a result, Evans was removed from management of the projects and efforts were made to salvage them. Those efforts were unsuccessful. (Interestingly, the district judge found the value of the

properties to have actually increased during the fraud.  But, in fairness, the projects' debt did as well.)  Evan's disinformation campaign was wrong, and fraudulent, as he has candidly admitted.  But that still leaves much to be decided.  His guilty plea begs a question, the answer to which has resulted in a sentencing dilemma—how does one measure the damages reasonably resulting from the <u>fraud</u> (not being candid with investors), rather than merely estimating the economic losses flowing from a flawed business plan, poor timing and market dynamics?  The business loss calculation is relatively easy; arriving at a reasonable estimate of damages is quite difficult, as we have seen.

What are the damages caused by the fraud?  Simply stated they are the money investors lost as a result of not having full and timely knowledge of the depth and breadth of the projects' shortcomings.  In other words, what investors additionally lost by being deprived of an opportunity to mitigate foregone losses.  But we know one thing: much of the loss had been incurred or was inextricably destined to be incurred before any fraudulent conduct commenced.

The first panel opinion charted the path to resolving the damages dilemma, but it was not followed on remand.  It was necessary for the government to produce sufficient evidence from which a reasonable estimate of **damages resulting from the fraud** could be computed.  *See* USSG §2B1.1, comment. (n.3(c)).  It failed to produce such evidence, saying it was beyond its ken.  Faced with a problematic record the district judge undertook an equally problematic differential analysis which neither of the parties

2

adopted (but the government dutifully, albeit reluctantly and ineffectively, pursued).  At the end of the day proof of damage was left wanting.  That leaves us no choice.

The result here may not be heralded as a model of perfect justice, but it will stand as a conscientious application of the law.  I concur in the Order & Judgment.