**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**July 2, 2024**

**FOR THE TENTH CIRCUIT**
_____

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

MEGAN HESS,

　　Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

SHIRLEY KOCH,

　　Defendant - Appellant.

Nos. 23-1008 & 23-1069

Nos. 23-1009 & 23-1078

_____

**Appeals from the United States District Court**
**for the District of Colorado**
**(D.C. Nos. 1:20-CR-00098-CMA-GPG-1 &**
**1:20-CR-00098-CMA-GPG-2)**
_____

Jacob Rasch-Chabot (Virginia L. Grady, with him on the brief) of Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant in 23-1008 and 23-1069.

Elizabeth S. Ford Milani (Cole Finegan, with her on the brief) of United States Attorney's Office, Denver, Colorado, for Plaintiff-Appellee in 23-1008 and 23-1069.

Submitted on the briefs:[*]

K. L. Penix of Alderman Law Firm, Fort Collins, Colorado, for Defendant-Appellant in 23-1009 and 23-1078.

Elizabeth S. Ford Milani (Cole Finegan, with her on the brief) of United States Attorney's Office, Denver, Colorado, for Plaintiff-Appellee in 23-1009 and 23-1078.

_____

Before **PHILLIPS**, **SEYMOUR**, and **MURPHY**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

Funeral-home owner and operator Megan Hess and her employee-mother, Shirley Koch, pleaded guilty to mail fraud for fraudulently obtaining, selling, and shipping dead bodies and body parts to medical research, plastination, and body-broker companies. Despite the Defendants' reaching plea agreements with the government that recommended guideline calculations and associated sentencing ranges under the United States Sentencing Guidelines, the district court applied additional enhancements and after doing so varied upward to the statutory maximum of 20 years for Hess and to 180 months for Koch.

Hess and Koch argue that the district court erred as a matter of law in its loss calculations, and Koch argues that the court incorrectly enhanced her

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument in 23-1009 and 23-1078. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). Those cases are therefore ordered submitted without oral argument.

sentence based on the court's finding that the offense involved a large number of vulnerable victims and that Koch committed the offense using sophisticated means. Hess also asks that we reassign her case to a different judge on remand. Because we agree with some of their arguments, we vacate their sentences and remand for further proceedings in accordance with this opinion.

## BACKGROUND

### I.    Factual Background

In 2009, Hess established a nonprofit organization, Sunset Mesa Funeral Foundation, Inc. (doing business as "Donor Services"), purportedly to "provide assistance to community members who have no resources for funeral/cremation services." H. App. vol. I, at 155. According to the stipulated facts in both Defendants' plea agreements, the primary purpose of Donor Services was to "harvest human remains—such as heads, torsos, arms, legs, and entire human bodies—and market them for sale to customers who used the remains for scientific, medical, or educational purposes." *Id.*; *see* K. App. vol. I, at 30–31. Hess also operated a funeral business at the same location, Sunset Mesa Funeral Directors (Sunset Mesa), which she purchased on behalf of Donor Services in 2011. As part of her funeral-home business, Hess would "frequently meet with victims seeking cremation services for themselves or their loved ones who had died" and often mislead those customers that "[Sunset Mesa] would cremate decedents and provide their cremated remains . . . back to the families." H. App. vol. I, at 156.

3

With her mother's help, Hess would "harvest body parts from, or prepare the entire bodies of, the decedents for sale in body broker services." *Id.* Koch was also "involved in meeting with families to discuss the disposition of deceased individuals, and processing and preparing bodies for body broker services." K. App. vol. I, at 31.

Sometimes customers would agree to donate partial or full remains for a reduced price on mortuary services, but this agreement was often obtained by "materially false representations." H. App. vol. I, at 157. Hess, and sometimes Koch, "misled [some victims] to believe that only small samples, such as tumors or portions of skin, [or only specified body parts or organs] would be taken for testing or research." *Id.* Other times, they falsely stated that the donated remains, including organs, would be used to treat living persons. Despite the limited nature of victims' consent in these cases, Hess and Koch "[f]requently . . . exceeded the authorization they obtained." *Id.*; *see* K. App. vol. I, at 33. Indeed, "[b]ody parts beyond those which were authorized, if not entire bodies, would be sold typically for purposes not even contemplated or agreed to by the victims." H. App. vol. I, at 157. If decedents or their next of kin[1] agreed to donation, Sunset Mesa would "give a discount" on the funeral-services costs. H. App. vol. V, at 20.

---

[1] We use the terms "next of kin" and "next-of-kin victims" because these are the terms the parties use to refer to customers who purchased funeral or cremation services on behalf of someone else.

Often, Hess and Koch "neither discussed nor obtained authorization for donation of decedents' bodies or body parts for body broker services." H. App. vol. I, at 23; K. App. vol. I, at 32. Other times, Hess and Koch raised the subject, but the next-of-kin customers declined to donate even for the offered discount. Even so, Hess and Koch would still dismember and sell those bodies. Over an eight-year span, they took the body parts or whole bodies of "hundreds of decedents." H. App. vol. I, at 23.

Hess developed donor authorization forms that were "purportedly . . . signed by victims when donation was authorized." *Id.* at 157. As part of their investigation, FBI agents examined Donor Services files showing that the bodies or body parts of 811 individuals were sold. Only 447 of these files contained donor authorization forms, of which "at least 187 were determined to be forgeries." *Id.* at 157–58. The FBI confirmed through interviews with next-of-kin victims that of the 811 individuals "at least 222 [deceased] victims were [confirmed] stolen" and an "additional 338 [deceased] victims . . . were almost certainly stolen."[2] *Id.* at 158. Many of those 338 decedents came from other funeral homes, with whom Sunset Mesa had subcontracted to provide cremation services. FBI interviews with those funeral homes "confirmed that donation was neither discussed with the victims nor authorized by the contracting funeral

---

[2] As we understand it, the government uses "stolen" to mean that body parts or bodies were sold without authorization.

homes." *Id.* So the bodies and body parts of 560 decedents were almost certainly obtained and sold by fraudulent means. Of the 811 individuals sold, only 42 individuals "were procured . . . through informed consent." *Id.* For the remaining 209 victims, FBI agents were unable to determine whether informed consent was obtained.

Through Donor Services, Hess advertised to purchasers that the available human remains had been "legitimately and freely donated for body broker services when this was often not the case." *Id.* at 157. The medical-research organizations, plastination companies, and body-broker services (collectively, "body-parts purchasers") that purchased remains from Donor Services "relied on the defendant's representations that the remains were legitimately donated." *Id.* at 158. Many of the body-parts purchasers required that the remains be disease-free, but in "dozens of instances," Hess sold and shipped diseased parts despite having received positive test results for HIV and Hepatitis and forging negative test results. *Id.* at 159. But the government did not offer evidence that anyone contracted diseases from infected bodies and no reports were filed indicating that any health issues resulted.

Because of Donor Services' income, Sunset Mesa could offer cremations that were the "least expensive option in the area," which "ensure[d] a constant supply of bodies." *Id.* at 166. In many instances, families were given cremation remains (cremains) "that were represented as that of their loved ones when that was not true." *Id.* Instead, those cremains were either replaced or mixed with

6

the remains of others. Despite this, next of kin were still typically charged $1,000 or more "for cremations that never occurred and funeral services that they would not have agreed to had they been informed of the truth." *Id.*

In October 2017, the FBI began investigating Sunset Mesa. The FBI executed a search warrant of the premises, generated publicity about the case to find potential victims, interviewed Sunset Mesa employees, and contacted families whose contact information the agents acquired from customer files.

## II.    Procedural Background

### A.    The Indictment and Plea Agreements

In March 2020, a grand jury indicted Hess and Koch on six counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2, and on three counts of transporting hazardous material in violation of 49 U.S.C. § 46312 and associated federal regulations.

#### 1.    *Hess's Plea Agreement*

Hess pleaded guilty to one count of mail fraud for shipping the fraudulently obtained remains of twelve bodies, one of which was infected with Hepatitis C. In exchange, the government dismissed the remaining counts. As part of her plea agreement, Hess agreed to a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1), a 2-level increase because the offense involved ten or more victims under § 2B1.1(b)(2)(A)(i), and a 3-level decrease based on acceptance of responsibility under § 3E1.1(a), (b).

7

As unstipulated terms, the government stated its intent to seek a 14-level increase under § 2B1.1(b)(1)(H), applicable if the loss exceeded $550,000. The government also stated its intent to seek a 2-level increase under § 2B1.1(b)(9)(A), based on Hess's misrepresentations that she was acting on behalf of a charitable or educational organization; a 2-level increase under § 2B1.1(b)(10)(C), based on the offense involving sophisticated means; a 2-level increase under § 2B1.1(b)(16), because the conduct involved a conscious or reckless risk of death or serious bodily injury; a 4-level increase under § 3A1.1(b)(1)–(2), because the offense involved a large number of vulnerable victims; a 2-level increase under § 3B1.1(c), because Hess was an organizer, leader, manager, or supervisor of the criminal activity; and a 2-level increase under § 3B1.3, based on Hess's abuse of a position of trust. After a 3-level decrease for acceptance of responsibility, the government estimated a total offense level of 34 and a criminal-history category of I.

### 2.    *Koch's Plea Agreement*

Koch pleaded guilty to a different count of mail fraud for shipping the fraudulently obtained remains of nine victims, one infected with Hepatitis C. The government dismissed the remaining counts and agreed to recommend a sentence within the advisory guideline range, for a total offense level of 26 and a criminal-history category of I. Supporting the agreed total offense level of 26, the plea agreement listed a base offense level of 7; a 12-level increase under § 2B1.1(b)(1)(G), because the loss exceeded $250,000 but was less than

8

$550,000; a 2-level increase under § 2B1.1(b)(2)(A)(i), because the offense involved ten or more victims; a 2-level increase under § 2B1.1(b)(9)(A), because Koch misrepresented that she was acting on behalf of a charitable organization; a 2-level increase under § 2B1.1(b)(16)(A), because the offense involved a conscious or reckless risk of death or serious bodily injury; a 2-level increase under § 3A1.1(b)(1), because Koch knew or should have known that the offense involved vulnerable victims; and a 2-level increase under § 3B1.3, because Koch abused a position of trust. The plea agreement provided for a 3-level reduction for acceptance of responsibility under § 3E1.1(a), (b).

The government agreed to recommend a sentence within the resulting advisory guideline range of 63 to 78 months. Koch maintained her right to appeal if her sentence "exceed[ed] the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history . . . at a total offense level of 26." K. App. vol. I, at 25.

## B.    The Presentence Reports (PSRs)

### 1.    *Hess's PSR*

In its PSR for Hess, the probation officer recommended all the government's requested sentencing enhancements, resulting in a total offense level of 34, a criminal-history category of I, and an advisory guideline range of 151 to 188 months. The PSR attributed $1,254,293.90 of actual loss to Hess. That figure included the amounts paid by the body-parts purchasers and the amounts paid by next of kin for cremation and funeral expenses. But the PSR

9

recommended no restitution payments for the body-parts purchasers, which the purchasers did not seek. The PSR concluded with a recommendation for an upward variance to the maximum statutory sentence of 240 months.

### 2.    *Koch's PSR*

In its PSR for Koch, the probation officer acknowledged that the government had attributed only $441,779.05 of actual loss to her, representing the *known* losses to next-of-kin victims. Rejecting the parties' agreed-upon figure, the PSR instead recommended the same 14-level adjustment as it did for Hess, contending that Hess and Koch were responsible for the same losses under relevant-conduct rules. Citing § 2B1.1 cmt. n.3(A)(iv), the PSR declared that the full actual losses—$1,254,293.90—should have been reasonably foreseeable to Koch. Thus, the PSR recommended a 14-level enhancement under § 2B1.1(b)(1)(H) for losses exceeding $550,000.

The PSR also recommended more enhancements not sought by the government: two offense levels under the sophisticated-means enhancement under § 2B1.1(b)(10)(C); and two levels under the large-number-of-vulnerable-victims adjustment under § 3A1.1(b)(2). All told, the PSR recommended a total offense level of 32 and a criminal-history category of I, setting an advisory guideline range of 121 to 151 months. But as it did for Hess, the PSR recommended an upward variance for Koch, but to a sentence of 180 months. As justification, the PSR observed:

10

> [Koch] was aware of what Hess was doing and was a willing participant in the crimes for many years. [Koch] met with families and made false representations for the sole purpose of securing their business and without any regard for the emotional turmoil related to their grieving. She bragged to a former employee and friend about a trip to Disneyland that was funded from selling gold teeth extracted from a decedent.

K. App. vol. III, at 37.

Hess and Koch each filed extensive written objections to their respective PSR's recommendations.

### C.    The Sentencing Hearing

On January 3, 2023, the district court held a sentencing hearing for both Hess and Koch. The government called an FBI agent as a witness and furnished the court with victim-impact statements, reading some excerpts into the record. The defense called a paralegal in support of its claim for credits against loss. After considering this evidence, the district court overruled the Defendants' PSR objections. It then heard statements from various next-of-kin victims and held a moment of silence "to honor all of the deceased victims and their families." H. App. vol. V, at 190. It considered the § 3553 factors, varied upward for both Defendants, and sentenced Hess to the statutory maximum of 240 months and Koch to 180 months. In March 2023, the court held a restitution hearing. Ultimately, it ordered restitution of $419,398.47, for which Hess and Koch would be jointly and severally liable.

**DISCUSSION**

We review a district court's sentence for an abuse of discretion. *United States v. Conley*, 89 F.4th 815, 819 (10th Cir. 2023). But when reviewing a district court's application of the Sentencing Guidelines, "we review legal questions *de novo* and . . . factual findings for clear error." *Id.* (quoting *United States v. Maldonado-Passage*, 4 F.4th 1097, 1103 (10th Cir. 2021)). The same standard applies to our review of loss calculations: If the petitioner raises a legal challenge to a loss calculation, then we review a district court's decision de novo. *United States v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014). For factual challenges to loss calculations, we review for clear error. *Conley*, 89 F.4th at 819.

Between them, the Defendants argue (1) that the district court erred in its loss calculations; (2) that the district court erred in applying the large-number-of-vulnerable-victims enhancement; (3) that the district court erred by applying the sophisticated-means enhancement; (4) that these procedural errors were not harmless; and (5) that we should reassign the case to a different judge for resentencing.[3]

Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we grant the Defendants' request to vacate their sentences and remand for

---

[3] Koch also challenges the substantive reasonableness of her sentence. But because we agree that her sentence was procedurally unreasonable, we do not reach her substantive-reasonableness arguments in this appeal.

further proceedings consistent with this opinion. But we deny Hess's request to reassign her case to a different judge.

## I.     The district court erred in calculating loss.

Sentencing guideline § 2B1.1(b)(1) sets base-offense levels for fraud convictions. Relevant here, "actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n.3(A)(i).[4] And "[p]ecuniary harm" is "harm that is monetary or that otherwise is readily measurable in money," which excludes "emotional distress, harm to reputation, or other non-economic harm." § 2B1.1 cmt. n.3(A)(iii). Against actual loss, the sentencing court must credit "the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." § 2B1.1 cmt. n.3(E)(i). So "loss equals loss (or intended loss) minus credits against loss." *United States v. Crowe*, 735 F.3d 1229, 1237 (10th Cir. 2013). Under § 2B1.1(b)(1), when the loss involved in the offense exceeds $250,000, then a 12-level increase applies, but if the loss exceeds $550,000, then a 14-level increase applies. § 2B1.1(b)(1)(G)–(H).

---

[4] "Commentary governs unless it runs afoul of the Constitution or a federal statute or is plainly erroneous or inconsistent with the guideline provision it interprets." *United States v. Maloid*, 71 F.4th 795, 805 (10th Cir. 2023) (cleaned up), *cert. denied*, 144 S. Ct. 1035 (2024).

Hess argues that the district court miscalculated loss in two ways: by including as loss the amounts paid to Hess by the body-parts purchasers, and by categorically refusing to credit against loss the value of the legitimate goods and services the next-of-kin victims received at the time of the fraud. Koch argues that the district court incorrectly attributed the same loss to her as it did to Hess.

For the following reasons, we conclude (1) that the district court erred by including in the actual-loss total the amounts the body-parts purchasers paid Hess, (2) that the district court erred by categorically refusing to offset the value of goods and services the next of kin received at the time of the fraud, but (3) that the district court correctly attributed the same loss to Koch as it did to Hess.

## A.    The body-parts purchasers did not suffer pecuniary loss.

Hess challenges the district court's determination that the body-parts purchasers suffered loss equal to the money that the body-parts purchasers paid her.[5] The government bears the initial burden of proving that the body-parts purchasers suffered a "harm that is monetary or that otherwise is readily measurable in money." § 2B1.1 cmt. n.3(A)(iii); *see United States v. Sutton*,

_____

[5] Hess concedes that one purchaser, Innoved, suffered an actual loss of $13,575, because the FBI seized those body parts as evidence. The discussion of the purchasers' pecuniary loss that follows here therefore excludes Innoved's documented loss.

14

520 F.3d 1259, 1262 (10th Cir. 2008) ("[T]he government has the burden of proving loss by a preponderance of the evidence."). In the proceedings below, the government estimated actual loss to the body-parts purchasers at $527,145.70, which it calculated based on invoices and bank records showing what the body-parts purchasers had paid Hess. It used an average amount per decedent to estimate transactions for which it could not find documentation. The government claimed that this was a conservative figure because "bank records show[ed] th[at Hess] received over $1.2 million for remains sold through Donor Services." H. App. vol. I, at 166. The government reasoned that the total sales by Hess ($527,145.70) equaled actual loss to the body-parts purchasers because they "would not have purchased the remains had they known the remains were not, in fact, donated and instead were stolen," and because "some of these body parts . . . contain[ed] infectious diseases." H. App. vol. I, at 402. The government argued that the purchasers "relied on [Hess's] representations that the remains were legitimately donated." *Id.*

Yet the PSRs for both Defendants found that no restitution was necessary for the body-parts purchasers because they did not request it and also because they "profited from the instant offense," "received a product as negotiated," and even "derived an economic benefit from the transaction." H. App. vol. III, at 109; K. App. vol. III, at 18; *see* H. Reply Br. at 5. What's more, the government did not object to the PSR's findings below. Nor did it offer any evidence of pecuniary harm to the body-parts purchasers, instead just reciting

the sales amounts. It called as a witness the FBI agent assigned to investigate the case, who testified that the body-parts purchasers did not know that the body parts were stolen and would not have done business with Hess had they known the truth. But beyond this, the government presented no evidence showing that the body-parts purchasers suffered any pecuniary harm.

At the sentencing hearing, the district court adopted the government's argument that "the money paid to defendant Hess by the medical research companies was the reasonably foreseeable pecuniary harm resulting directly from fraud, and therefore constitutes loss for purposes of 2B1.1(b)(1)." H. App. vol. V, at 74. It also found that the government's calculation of loss, as set out in the PSR, was "a reasonable estimate of loss based on available information and other enumerated factors." *Id.*; *see Sutton*, 520 F.3d at 1263 ("A district court need only make a reasonable estimate of the loss." (cleaned up)). The district court found that the body-parts purchasers "would not have purchased the remains had they known the remains were not in fact donated, and instead were stolen." H. App. vol. V, at 73–74. But with no evidence in the record that the purchasers suffered pecuniary harm and given the uncontested statements in the PSR to the contrary, we lack a factual basis on which to defer to the district court's estimate of actual loss to the purchasers. *See Sutton*, 520 F.3d at 1263.

We next turn to the district court's legal reasoning for this determination, examining it de novo. *See Conley*, 89 F.4th at 819. The district court's conclusion that actual loss includes the money paid by the body-parts

16

purchasers runs contrary to a plain reading of the Guidelines. Again, "[a]ctual loss" is defined as the "reasonably foreseeable pecuniary *harm* that resulted from the offense." § 2B1.1 cmt. n.3(A)(i) (emphasis added). And harm, by definition, must involve some damage or injury. *See Harm*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harm#dictionary-entry-1 (last visited June 4, 2024) (defining "harm" as "physical or mental damage" and listing "injury" as a synonym for "harm"). "Pecuniary harm" is "harm that is monetary or that otherwise is readily measurable in money." § 2B1.1 cmt. n.3(A)(iii).

The district court's legal analysis is faulty. Pecuniary harm is not the money customers paid to a fraudster that they may not have paid had they known of the fraud. Instead, pecuniary harm equals the amount that the victim *lost*. *See United States v. Qazah*, 810 F.3d 879, 890 (4th Cir. 2015) ("Loss, by definition, would require a victim and would represent an amount that is lost or taken away from the victim.").[6] Aside from the loss suffered by one company, Innoved—from whom body parts were seized as evidence—the record provides

---

[6] The district court's reliance on *United States v. Executive Recycling, Inc.*, 953 F. Supp. 2d 1138 (D. Colo. 2013), is misplaced. The district court concluded in *Executive Recycling* that, absent the defendants' misrepresentations, "the Victims would not have contracted with Executive Recycling and would not have paid *any* money to Executive Recycling," and so "the money paid to Defendants by the Victims was the reasonably foreseeable pecuniary harm resulting directly from the fraud, and therefore constitutes the 'loss' for purposes of § 2B1.1(b)(1)." *Id.* at 1149–50. We do not find *Executive Recycling* persuasive and it lacks citation to any legal authority on this point.

17

no support for a finding that the body-parts purchasers lost any money or suffered any financial harm as a result of the Defendants' fraud.

On appeal, the government defends the district court's findings that "the fair market value to the Donor Services buyers was the price they paid to Hess, thinking they were buying legitimately donated and disease-free human remains." H. Resp. Br. at 25. True, the Guidelines advise that an estimation of loss

> shall . . . tak[e] into account, as appropriate and practicable under the circumstances, factors such as . . . [t]he fair market value of the property unlawfully taken, . . . or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

§ 2B1.1 cmt. n.3(C)(i). But this guidance is appropriate in calculating loss to the person from whom something has been taken. *See, e.g.*, *United States v. Wasz*, 450 F.3d 720, 724–25, 729 (7th Cir. 2006) (applying the total retail value—as opposed to the lesser amount of gross profit—of stolen items to calculate a retailer's loss); *United States v. Williams*, 50 F.3d 863, 864 (10th Cir. 1995) (affirming the district court's use of retail value of goods where goods were "stolen from a retail establishment, not from a wholesaler"). Such is not the case here. Fair market value as a measure of loss is simply not "appropriate . . . under the[se] circumstances." § 2B1.1 cmt. n.3(C); *see United States v. Machado*, 333 F.3d 1225, 1228 (11th Cir. 2003) ("We are persuaded by the approach [of other circuits] measuring loss within the factual circumstances presented, rather than a universal retail market value.").

18

The government also argues that district courts can use "the gain that resulted from the offense [as an alternative measure of loss]" if the loss "reasonably cannot be determined." H. Resp. Br. at 25 n.4 (quoting § 2B1.1 cmt. n.3(B)). But the district court did not make a finding that the actual loss to the body-parts purchasers could not be determined. The government cannot short-circuit the loss calculation by using "the gain that resulted from the offense" without first attempting to prove actual loss in the first instance. § 2B1.1 cmt. n.3(B); *see United States v. Galloway*, 509 F.3d 1246, 1252 (10th Cir. 2007) ("The defendant's gain may be used only as an alternate estimate of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims." (cleaned up)).

In sum, the district court erred in its legal conclusion that the body-parts purchasers suffered a pecuniary harm of $527,145.70 and received nothing of value because they would not have done business with the Defendants had they known about the fraud. And because the government did not meet its burden to show that the purchasers suffered any pecuniary harm, it "is not entitled to a remand so that it can present additional evidence and seek additional findings of fact and conclusions of law to support the . . . enhancement when it failed to offer such evidence and seek those findings and conclusions during the initial sentencing hearing." *United States v. Canty*, 570 F.3d 1251, 1257 (11th Cir. 2009).

19

**B.** **The district court erred by categorically refusing to offset actual loss with the value of legitimate goods and services provided to the next-of-kin victims.**

We turn next to Hess's argument that the district court erred by categorically refusing to offset actual loss suffered by the next-of-kin victims with credits against loss under § 2B1.1 cmt. n.3(E)(i). Though we recognize that the next-of-kin victims have suffered emotional harms that may be redressable in another forum, the Sentencing Guidelines direct our focus to pecuniary harms. § 2B1.1 cmt. n.3(A)(iii).

The Guidelines Commentary instructs that actual "[l]oss *shall* be reduced by . . . the fair market value of the property returned and the services rendered." § 2B1.1 cmt. n.3(E) (emphasis added). Calculating net loss "requires the court to deduct from the loss calculation any value the defendant gave the victim at the time of the fraud." *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998). So district courts must determine which goods and services did provide value to the victims at the time of the fraud, as opposed to those that did not provide value because they were just business expenditures or merely facilitated the fraud. *See, e.g.*, *Evans*, 744 F.3d at 1198 (affirming the district court's finding that $4.5 million the defendant put into partnerships should not be credited against loss because it "provided no ultimate benefit to the investors and prolonged the fraud"); *United States v. Stochel*, 901 F.3d 883, 890 (7th Cir. 2018) ("The fraudster's costs shouldn't be deducted any more

20

than the costs of a burglar's tool should be deducted in determining the loss suffered by the victim of the burglary." (cleaned up)).

Hess concedes that the next-of-kin victims *did* suffer some pecuniary harm.[7] *See* H. Op. Br. at 16 ("Unlike the medical research companies, the [next-of-kin] victims did suffer harm measurable in money."). She acknowledges that, "[a]t a minimum, the [next-of-kin] victims were overcharged for cremations. . . . Ms. Hess charged [next-of-kin] victims full price for cremations when remains were harvested and sold to the medical research companies." *Id.* at 16 n.5. And Hess does not challenge the government's calculations of known ($441,779.05) and estimated ($285,369.15) losses to next-of-kin victims, totaling $727,148.20. She thus concedes that the government met its initial burden of proving actual loss to the next of kin.

But Hess asserts that 29.12% ($211,745.55) of that loss amount was "for goods and services provided and should have been credited against loss," H. Op. Br. at 22, lowering the total loss to $515,402.65. In support, Hess argues that she provided goods and legitimate services such as "urns, memorial folders, register books, floral, memorial service[s], reception/food/catering, video production, professional service fee[s], keepsakes, death certificates, mailing fees, fees to open and close graves, disaster pouches, visitation events,

---

[7] We do not decide here whether the next of kin in fact suffered pecuniary harm but accept Hess's concession for the purposes of this appeal.

21

vaults, headstone foundations, setting foundation[s], obituaries, grave markers, custodian[s] at church, musicians and clergy." [8] H. Op. Br. at 6 n.3; H. App. vol. I, at 204–05.

At the sentencing hearing, the district court "decline[d] to reduce the loss amounts associated with funeral expenses . . . because the Court f[ound] that [Donor Services] and defendant Hess's business dealings were systematically tainted with fraud such that all services were affected by fraud in some way." H. App. vol. V, at 75. The district court found "that in every step of the process of making final arrangements for the remains of their loved ones, next of kin were defrauded by defendants Koch and Hess in furtherance of this scheme." *Id.* at 76. It also found that offsetting the Defendants' expenditures would "legitimize[] the profits that she fraudulently made."[9] *Id.* Though we accept the

---

[8] Added to the $13,575 for actual loss suffered by Innoved, *see* n.6, *supra*, Hess contends that the total loss is $528,977.65, which is less than the $550,000 required for the 14-level enhancement.

[9] We do not agree with the district court that to allow Hess to deduct "the price of services and tangible items legitimizes the profits that she fraudulently made." H. App. vol. V, at 76 (citing *United States v. Jarvis*, No. CR 13-2379, 2015 WL 7873740 (D.N.M. 2015)). In *Jarvis*, the district court declined to adopt the defendant's proposed method of measuring its legitimate services by comparing them with the services the victim later paid a legitimate broker. 2015 WL 7873740, at *9. This was in part because that method would "reduce the loss amount by a figure that includes the Defendants' profit margin" and doing so would "legitimize[] some of the profit they fraudulently made." *Id.* Unlike the broker's profit-margin proposal in *Jarvis*, Hess is not arguing that her loss amount be reduced by her profit margin, nor that we calculate the value of the services she provided by comparing them with those provided by other funeral directors. So *Jarvis* is unhelpful here.

district court's factual finding that the government's estimation of loss was reasonable, we examine de novo the court's legal determinations regarding loss offsets. *See Evans*, 744 F.3d at 1196.

The district court relied on *United States v. Miell*, 661 F.3d 995 (8th Cir. 2008), for the general principle that where a defendant's "business dealings were . . . 'systematically tainted with fraud,'" a court may decline to offset the loss calculation. H. App. vol. V, at 72 (quoting *Miell*, 661 F.3d at 1001). But *Miell* does not give the court permission to categorically refuse to offset legitimate services rendered. *See Miell*, 661 F.3d at 1001 (affirming sentence where the district court applied a 26% offset to loss calculations in a landlord's fraudulent damage-deposit scheme because the government presented evidence that the landlord returned "some portion of damage deposits 26% of the time"). *Miell* does support the proposition that, where the evidence available to the prosecution for its initial loss calculations is systematically tainted with fraud such that estimating net loss is impossible, the burden then shifts to the defendant to prove loss offsets. *See, e.g.*, *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012) (agreeing with *Miell* that the defendant "should not reap the benefits of a lower sentence because of his ability to defraud the government to such an extent that an accurate loss calculation is not possible" and concluding that, "where the government has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a

23

showing that particular amounts are legitimate"); *cf. United States v. Karie*, 976 F.3d 800, 806 (8th Cir. 2020) (observing that "[w]here a defendant's dealings are 'systematically tainted with fraud,' a district court may determine that the total amount of payments equals the loss amount" and that, "[a]lthough the ultimate burden of proving loss always remains with the government, the [Mandatory Victim Restitution Act] authorizes the district court to place on the defendant a burden of producing evidence of any legitimate services" (first quoting *Miell*, 661 F.3d at 1001; and then quoting *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019))).

*Miell*'s burden-shifting framework does not apply here because the government does not argue, nor did the district court find, that the 2015 invoices on which Hess based her 29% offset calculation are too "systemically tainted with fraud" to be reliable, nor that the next of kin did not receive the goods and services itemized in those invoices. We note only that *Miell* does not give the district court permission to ignore the Guidelines' mandatory language that "[l]oss *shall* be reduced by . . . the fair market value of the property returned and the services rendered." § 2B1.1 cmt. n.3(E) (emphasis added).

On remand, the district court should determine, in the first instance, which of the goods and services provided value to the victims at the time of the fraud, and which did not because they were just business expenditures or

24

merely facilitated the fraud.[10] When examining the value of Hess's purportedly legitimate goods and services to the next of kin, the district court should consider which goods and services (1) derived their pecuniary value (to the next of kin) from their physical association or connection with the decedents' remains, (2) retained their value independently from any association or connection with the decedents' remains, or (3) were consumable or ephemeral such that their value was expended at the time of the fraud and was not subsequently diminished by the fraud's discovery. We therefore vacate the district court's loss calculations and remand for further proceedings.

### C.     The district court correctly attributed to Koch the loss from Hess's conduct under § 1B1.3(A).

Koch argues that she was not accountable for the same loss amount as Hess and so the district court erroneously applied the same 14-level increase for loss over $550,000. A defendant's base offense level "will be based in part on relevant conduct, which goes beyond simply the conduct for which the defendant was convicted." *United States v. Green*, 175 F.3d 822, 837 (10th Cir.

---

[10] The government asserts that "[t]he money Hess spent on goods and services for the next-of-kin victims only perpetuated the fraud that she was running a legitimate funeral home." H. Resp. Br. at 33 n.7. But the real question is whether the goods and services conferred no value or benefit on the next-of-kin victims. *See* H. Reply Br. at 9 ("Importantly, nowhere in the district court's discussion of this issue does it so much as hint at a finding that the goods and services Ms. Hess provided—such as flowers, food, videos, obituaries, and death certificates—conferred no value on the victims." (citations omitted)).

1999). The Guidelines outline two ways to capture relevant conduct for sentencing purposes. § 1B1.3(a)(1)(A)–(B). First, a defendant's relevant conduct "shall be determined on the basis of . . . all acts . . . committed, aided, abetted, . . . or willfully caused by the defendant." § 1B1.3(a)(1)(A). Second, "in the case of a jointly undertaken criminal activity," it shall be determined on the basis of

> all acts and omissions of others that were . . .
>
> (i)     within the scope of the jointly undertaken criminal activity,
> (ii)    in furtherance of that criminal activity, and
> (iii)   reasonably foreseeable in connection with that criminal activity.

§ 1B1.3(a)(1)(B).

This means that Koch's loss calculation encompasses "all harm that resulted from the acts and omissions specified in [§ 1B1.3(a)(1)(A)] . . . and all harm that was the object of such acts and omissions." § 1B1.3(a)(3). While "[i]n certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline[,] [i]f a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established." § 1B1.3 cmt. n.2.

Because we reverse the district court's finding that the body-parts purchasers suffered actual loss, *see* Discussion § I(A), *supra*, we do not reach Koch's argument that she is not responsible for loss to the body-parts

26

purchasers. We focus instead on her responsibility for loss to the next-of-kin victims. Excluding the loss to body-parts purchasers, the PSR recommended holding Koch responsible for both known and estimated funeral expenses, which totaled $727,148.20. At the sentencing hearing, the district court agreed with the PSR and rejected the government's attempts to limit losses attributable to Koch to $441,779.05 in accordance with the plea agreement.

Defending the district court's decision on appeal, the government now argues that Koch can be held responsible for the entire loss amount attributed to Hess based on § 1B1.3(a)(1)(A), not (B), so the district court did not need to make the "particularized findings" that subsection (B) requires.[11] K. Resp. Br. at 29. We agree.

Assuming Koch is correct that the district court did not make sufficient particularized findings to hold her accountable for Hess's conduct under § 1B1.3(a)(1)(B), it nevertheless made findings that support the loss amount under subsection (A). That subsection provides that a defendant's "specific

---

[11] To hold a defendant accountable for the conduct of others under § 1B1.3(a)(1)(B), the district court must "first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)." § 1B1.3 cmt. n.3(B). In determining the scope of the particular defendant's agreement, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* But "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)." *Id.*

offense characteristics" shall be determined based on "all acts . . . committed, aided, abetted, . . . or willfully caused by the defendant." § 1B1.3(a)(1)(A). The district court made the finding that "Koch aided and abetted defendant Hess in this scheme. Specifically, defendant Koch did meet with families seeking cremation services on occasion. At that time she represented to families that their loved one would be cremated, and the cremains would be returned to the families." [12] K. App. vol. V, at 256. It also found that Koch "engaged in the work to prepare those bodies for purported donation to medical research companies, including drawing blood from decedents and submitting that blood for testing." *Id.* Koch had stipulated to her work in preparing the bodies for sale in her plea agreement. *See* K. App. vol. I, at 31 ("Defendant KOCH was involved in meeting with families to discuss the disposition of deceased individuals, and processing and preparing bodies for body broker services.").

Koch does not explain why the district court erred in holding her responsible for estimated as well as known losses based on Subsection (A). She argues that she spoke to families only "on occasion" and that "the losses that were reasonably foreseeable to her were those suffered by the families of the deceased ($441,779.05)." K. Op. Br. at 20. But the "reasonably foreseeable" language comes from § 1B1.3(a)(1)(B), not (A). Koch does not address this

---

[12] In ruling on another enhancement, the district court found generally that Koch "aided and abetted [Hess's] conduct through most of the time of the scheme." K. App. vol. V, at 258–59.

28

deficiency in her reply brief, but instead faults the government for arguing the opposite in briefing before the district court and during sentencing: "[T]his is the first time the Government argues estimated expenses for decedents with no known records should be applied to Koch." K. Reply Br. at 7 (emphasis omitted). She argues that "[t]he Government may not, for the first time on appeal, argue Koch's guideline sentence should be further enhanced due to additional, estimated expenses." *Id.* at 8 (citing *Canty*, 570 F.3d at 1257).

Koch cites *Canty* for the proposition that "[t]he government is entitled to an opportunity to offer evidence and seek ruling from the sentencing court in support of an enhanced sentence. But the Government is entitled to only one such opportunity, and it had that opportunity at the sentencing hearing." *Id.* (quoting *Canty*, 570 F.3d at 1257). But just as we may affirm the district court on any ground supported by the record, the government as "appellee is generally permitted to defend the judgment won below on any ground supported by the record without filing a cross appeal." *Frasier v. Evans*, 992 F.3d 1003, 1019 (10th Cir. 2021) (cleaned up). Koch does not adequately refute the government's argument that Koch was responsible for the same amount of loss as Hess under § 1B1.3(a)(1)(A). The district court did not clearly err in so finding.

In sum, as with Hess, without the "actual loss" from the body-parts purchasers, the amount of loss sustained by the next-of-kin victims for which Koch is also responsible would still be $727,148.20. *See* Discussion § I(A),

29

*supra.* Because this amount may be reduced on remand after the district court's determinations regarding credits-against-loss, *see* Discussion § I(B), *supra*, we remand Koch's case to the district court for further proceedings in accordance with this opinion.

## II. The district court erred by failing to make particularized findings to support the large-number-of-vulnerable-victims enhancement.

On appeal, Koch challenges the district court's application of a 2-level enhancement that applies when the offense involves a "large number of vulnerable victims" under § 3A1.1(b)(2), on top of the 2-level enhancement for vulnerable victims under subsection (b)(1) included in her plea agreement. Section 3A1.1(b)(1) provides for a 2-level increase "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim," while § 3A1.1(b)(2) provides for an additional 2-level increase if "the offense involved a large number of vulnerable victims." The Guidelines Commentary on this enhancement defines a "vulnerable victim" as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." § 3A1.1 cmt. n.2. A "vulnerable victim" must be unusually susceptible to the particular crime committed, not just a vulnerable person in general. *See, e.g.*, *United States v. Scott*, 529 F.3d 1290, 1302 (10th Cir. 2008) (agreeing with other courts that "an

30

unstable personal life is sufficiently common among Mann Act victims that [the victim's] runaway status cannot support the enhancement").

The Guidelines Commentary provides examples:

> The [vulnerable-victim enhancement] would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.

§ 3A1.1 cmt. n.2. These examples highlight the guideline's requirement of a nexus between the fraud and the victim's vulnerability; that is, the victim's vulnerability must somehow facilitate or enable the fraud. *See United States v. Lee*, 973 F.2d 832, 834 (10th Cir. 1992) ("[T]here should be a nexus between the victim's vulnerability and the crime's ultimate success. An armed robbery of a blind, elderly, or physically disabled shopkeeper would normally trigger § 3A1.1, because the additional vulnerability of handicap or age *has been exploited*." (cleaned up)); *Janusz*, 135 F.3d at 1325 (finding a "strong[] nexus" between elderly victims' vulnerability and defendant's ability to defraud them).[13]

---

[13] Though the Guidelines no longer require that a defendant specifically *target* her victim because of the victim's vulnerability, this change does not overcome the nexus requirement. *See United States v. Hardesty*, 105 F.3d 558, 561 (10th Cir. 1997) ("[T]he commentary to U.S.S.G. § 3A1.1 was altered by deleting the following language appearing in its predecessor: 'This adjustment applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the [defendant].'").

Courts must "make particularized findings of vulnerability" that support the enhancement, focusing on "the victim's personal or individual vulnerability." *United States v. Kaufman*, 546 F.3d 1242, 1269 (10th Cir. 2008) (citation omitted).[14] Mere "[m]embership in a class of individuals considered more vulnerable than the average individual is insufficient standing alone." *United States v. Proffit*, 304 F.3d 1001, 1007 (10th Cir. 2002). But we have held that "[i]n some cases the inference to be drawn from the class characteristics may be so powerful that there can be little doubt about unusual

---

[14] In more run-of-the-mill fraud cases, a victim's financial situation, age, grief, terminal illness, or other mental or physical condition may make them particularly susceptible to, and thus enable, a financial fraud. *See United States v. Johns*, 686 F.3d 438, 460 (7th Cir. 2012) ("[F]inancial desperation is enough to make one vulnerable to financial crimes."); *accord United States v. Mack*, No. 21-4100, 2023 WL 3163247, at *6 (10th Cir. May 1, 2023) (citing *Johns*, 686 F.3d at 460 for that proposition); *see also United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013) (affirming the district court's application of the vulnerable-victim enhancement where one victim was "grieving the loss of a spouse" and was an "inexperienced investor[]" who was therefore "particularly susceptible" to the defendant's fraud); *United States v. Moskal*, 211 F.3d 1070, 1073 (8th Cir. 2000) (affirming the district court's application of vulnerable-victim enhancement to the sentence of a personal-injury-lawyer defendant who stole from clients, including clients who were "either HIV-positive or dying of AIDS"); *United States v. Stewart*, 33 F.3d 764, 771 (7th Cir. 1994) (reversing the district court for concluding that the elderly were not vulnerable victims because "the inevitable physical or mental consequences of their own mortality" made them "especially vulnerable" to the defendant's fraudulent scheme); *United States v. Harris*, 38 F.3d 95, 99 (2d Cir. 1994) (affirming application of vulnerable-victim enhancement where victims included "a grieving widow," another "71 year old widow," and "a 23 year old recent accident victim," because "their ages and difficulties in providing for themselves" made them "particularly susceptible to alluring promises of financial security").

vulnerability of class members within the meaning of section 3A1.1." *United States v. Tissnolthtos*, 115 F.3d 759, 762 (10th Cir. 1997) (citation omitted); *see United States v. Caballero*, 277 F.3d 1235, 1250 (10th Cir. 2002) ("We have found application of this enhancement appropriate when some characteristics render a victim particularly susceptible to the criminal conduct." (cleaned up)).

The district court erred by making class determinations of vulnerability for two categories of victims: the decedents themselves and their grieving family members. *See* K. App. vol. V, at 243 ("560 decedents['] . . . bodies and body parts were stolen in this operation" and "560 victims and their families as victims is a large number.").[15] We examine each of the court's class determinations in turn.

First, the district court found "that the deceased victims were clearly vulnerable due to their physical condition. They could no longer make their own decisions or protect themselves from what happened to their bodies after death." *Id.* at 240. The court erred insofar as it based its application of § 3A1.1(b)(2) on harms inflicted after death. *Cf. United States v. Shumway*, 112 F.3d 1413, 1422–23 (10th Cir. 1997) ("We hold USSG § 3A1.1(b) does not

---

[15] The district court "overrule[d] defendant Hess' objections" and applied 2-level enhancements under § 3A1.1(b)(1) and (2). K. App. vol. V, at 243. In ruling on Koch's objection to § 3A1.1(b)(2), it "incorporate[d] by reference the same legal analysis it did with respect to Hess' objection." *Id.* at 260.

apply to prehistoric human skeletal remains. We are convinced that to interpret 'vulnerable victim' to include skeletal remains would stretch the imagination, and would render application of USSG § 3A1.1(b) potentially absurd." (footnote omitted)); *United States v. Hanson*, 264 F.3d 988, 999 (10th Cir. 2001) (relying on *Shumway* to contrast § 5K2.8—for extreme conduct—with § 3A1.1 because "USSG § 5K2.8 may be imposed even though the victim is dead or unconscious when the defendant engages in the alleged conduct"). The government concedes this point, noting that it "only relies upon the surviving families as victims for purposes of this enhancement." K. Resp. Br. at 37 n.6. Though corpses are indeed "unable to protect themselves," it does not follow that they "require greater societal protection" than the living. *Proffit*, 304 F.3d at 1007. Thus, victims who were deceased when the fraud was committed were not vulnerable victims for the purpose of this enhancement.

Second, the district court erred in finding that "[t]hose in grief are vulnerable victims" because it did not explain how the next-of-kin victims' grief made it any easier for the Defendants to commit their fraud. K. App. vol. V, at 241. The district court related a personal anecdote about grief and quoted some of the victim-impact statements in support of this class determination.[16] It

[16] For example: "[F]uneral home morticians are in a unique position of trust, sacred trust that they abused against the most vulnerable populations, the grieving, the dying, and the dead." K. App. vol. V, at 240. It continued: "Another one said, in many instances, the defendant lied to and stole from victims at the time they were most vulnerable, while they were dying." *Id.* at

(*footnote continued*)

reasoned that "[a]nyone who has experienced the death of a loved one knows that that loss is devastating and impacts one's mental and emotional state of mind. Those in grief are vulnerable victims." *Id.* But contrary to the district court's approach, a victim does not become a "vulnerable victim" under § 3A1.1(b) just because he or she was vulnerable in a general sense and the victim of a crime.

We do not agree that the inference of vulnerability to be drawn from those who have lost a family member is so powerful "that there can be little doubt about [their] unusual vulnerability" to the fraud that occurred here. *Tissnolthtos*, 115 F.3d at 762. Everyone who went to Sunset Mesa to purchase funeral or cremation services was duped by the Defendants' scheme—we cannot tell that those in grief were more susceptible to believing the Defendants' lies than those who were not, nor that those in grief were more prone to agreeing to a discount than others. Even many who rejected the Defendants' offer of a discount in exchange for the donation of body parts were still defrauded. The Defendants did not exploit those who were grieving but honor the wishes of those who were not. The Defendants were able to commit their fraud by virtue of their positions of trust and their unsupervised custody

---

240–41. "Another victim indicates Megan Hess took advantage of so many people when we were at our most vulnerable." *Id.* at 242. "Another victim indicates she took advantage of people when they were at the most vulnerable times in their lives. She made false promises and lied to people very successfully to convince them to trust her during times of great grief." *Id.*

35

over the decedents' bodies, and we see nothing in the record that explains how either of these enabling conditions would depend on any individual's vulnerability.[17]

The government defends the district court's determination on appeal, arguing that, "[e]ven if individualized findings *were* required, . . . the record still supported the court's application of § 3A1.1(b)(2)." K. Resp. Br. at 39. Though the excerpts from the victim-impact statements the government read into the record at the sentencing hearing show that many next of kin were in mental and emotional turmoil following the death of loved ones, so vulnerable in a general sense, they do not establish the requisite nexus between those victims' vulnerability and this particular fraud to support the enhancement's application. So on remand, the district court must explain how any individualized vulnerability—from grief or any other "physical or mental condition"—enabled or facilitated commission of the fraud. § 3A1.1 cmt. n.2.

We therefore reverse the district court's application of the large-number-of-victims enhancement and remand for further proceedings in which the district court may make particularized findings of vulnerability showing the requisite nexus between vulnerability and the Defendants' fraud to support the application of § 3A1.1(b)(2).

---

[17] Koch received a 2-level enhancement for abuse of a position of trust under § 3B1.3, which she does not challenge on appeal.

### III.    The sophisticated-means enhancement does not apply to Koch.

Koch next challenges the district court's application of a 2-level increase under § 2B1.1(b)(10)(C) for her use of "sophisticated means." K. Op. Br. at 21. The sophisticated-means enhancement provides for a 2-level increase if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." § 2B1.1(b)(10)(C). "[S]ophisticated means" are defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. n.9(B). The Commentary gives a couple of examples: "[I]n a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction," or "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells or offshore financial accounts." *Id.*

Some examples of how we have applied this enhancement help set the stage for the conduct at issue here, though none are factually similar. We first addressed this enhancement in *United States v. Rice*, where we reversed the district court's application of the enhancement where the defendant's "tax evasion scheme was not sophisticated" because "[h]e merely claimed to have paid withholding taxes he did not pay." 52 F.3d 843, 849 (10th Cir. 1995). While the "trial court's finding [was] entitled to deference, we [were] hard pressed to agree with its conclusion." *Id.* We explained: "If that scheme is

37

sophisticated within the meaning of the guidelines, then every fraudulent tax return will fall within that enhancement's rubric." *Id.*

By contrast, in *United States v. Guidry*, we concluded that the sophisticated-means enhancement was appropriate where the defendant managed to hide her embezzlement not only from her employers but from the IRS, designing a scheme to "conceal the existence and extent of her failure to file a truthful tax return" by only depositing a small fraction of the embezzled funds in a bank, and by never taking more than $10,000 in a day. 199 F.3d 1150, 1158–59 (10th Cir. 1999). We also agreed with the enhancement's application in *United States v. Wardell*, where the defendant's fraud did not involve shell corporations or offshore accounts, but while "incarcerated in a state prison" he managed to "use numerous individuals and fictitious entities, addresses, and paperwork to create the illusion that he earned income and was entitled to multiple tax refunds." 218 F. App'x 695, 698 (10th Cir. 2007) (unpublished).

In *United States v. Weiss*, we also affirmed application of the enhancement where the district court made findings that the defendant used an "intricate process . . . to conceal his funding of the down payments" in a mortgage-related mail fraud scheme of "'remarkable' scope." 630 F.3d 1263, 1279 (10th Cir. 2010). Though the defendant challenged the enhancement's application because it involved "a series of uncomplicated single steps," we ruled that "the enhancement applies when the execution or concealment of a

38

scheme, viewed as a whole, is 'especially complex or especially intricate.'" *Id.* (quoting § 2B1.1 cmt. n.9(B)).

Here, Koch does not contest that the scheme itself involved sophisticated means but only that the enhancement applies to her—she argues that *she* did not "intentionally engage[] in or cause[] the conduct constituting sophisticated means." § 2B1.1(b)(10)(C). She asserts that "the district court failed to provide a factual basis to establish that *any* action taken by Koch involved sophisticated means." K. Op. Br. at 22. Koch contends that she was not involved with Hess's conduct, such as "structuring multiple businesses . . . to disguise criminal activity . . . , forging donor forms, and handling critical communications with the businesses . . . purchasing body parts." *Id.* Indeed, the district court made the following findings:

> Although it was defendant Hess who combined her funeral home business and Donor Services, allowing her to continue her scheme for nearly a decade unabated, she could not have done that without the assistance of defendant Koch. Defendant Koch was involved in so many facets of this scheme, from picking up the deceased bodies to meeting with grieving family members, trying to talk them into donating body parts, lying to them about the cremation services that would be provided, knowing in many cases that the bodies or parts of the bodies had already been sold to buyers. She also extracted the body parts from the decedents' bodies and shipped them to the purchasers, even in cases where families had not authorized donations.
>
> Defendant Koch was intimately involved in major aspects of this sophisticated scheme and artifice to defraud and to obtain money and property from decedents and their families or representatives and other customers by means of materially false and fraudulent pretenses, representations, and promises which were involved in the scheme. She aided and abetted that conduct through most of the time

of the scheme. But for her intentional conduct and role, this offense
would likely not have gone on as long undetected.

K. App. vol. V, at 258–59.

Koch argues on appeal that her "generic involvement" with "major
aspects" of a scheme "does not satisfy the guideline requirement that Koch
'intentionally engaged in or caused the conduct constituting sophisticated
means.'" K. Op. Br. at 23 (quoting § 2B1.1(b)(10)(C)). She summarizes her
conduct as "transporting or preparing bodies, meeting with family and shipping
body parts to brokers." *Id*.

We agree with Koch that the enhancement does not apply to her. In 2015,
the Sentencing Commission "narrow[ed] the focus of the specific offense
characteristic . . . to cases in which the defendant intentionally engaged in or
caused conduct constituting sophisticated means." U.S.S.G. Supp. to App'x C,
Amend. 792 (Nov. 1, 2015). This was because, "[p]rior to the amendment, . . .
courts had applied this enhancement on the basis of the sophistication of the
overall scheme without a determination of whether the defendant's own
conduct was 'sophisticated.'" *Id*.; *see also United States v. Griffin*, 76 F.4th
724, 751 (7th Cir. 2023) (noting the 2015 amendment and its narrowing effect).

So, since then, the sophisticated-means enhancement has included two
conjunctive prongs: (1) the "offense otherwise involved sophisticated means
*and* (2) the defendant intentionally engaged in or caused the conduct
constituting sophisticated means." § 2B1.1(b)(10)(C) (emphasis added). In a

nod to the narrowed enhancement, the government argues that "[e]ven if only Hess had taken sophisticated steps in this scheme . . . Koch still *caused* that conduct to occur, so the enhancement was proper." K. Resp. Br. at 34. But this argument finds no support in the record. That Hess could not have perpetrated her overall scheme (which included Hess's sophisticated means) without Koch's assistance does not mean that Koch *caused* the sophisticated conduct to occur.

The government asserts that "Koch intentionally engaged in conduct constituting sophisticated means" because "[e]ven if her individual contributions to the enterprise were rudimentary, 'repetitive and coordinated conduct can amount to a sophisticated scheme.'" K. Resp. Br. at 34 (quoting *Weiss*, 630 F.3d at 1279). But the "repetitive and coordinated conduct" in *Weiss*, 630 F.3d at 1279 (quoting *United States v. Jenkins-Watts*, 574 F.3d 950, 962 (8th Cir. 2009)), involved "complex[] . . . calculations . . . to ensure the loan-to-value ratios, mortgage-payment-to-income ratios, and total-fixed-payment-to-income ratios met the HUD's requirements," *id.* Koch's "repetitive" conduct here—"meeting with families to discuss the disposition of deceased individuals, and processing and preparing bodies for body broker services," K. App. vol. I, at 31—does not rise to the level of sophistication or complexity we found necessary in *Guidry*, *Wardell*, or *Weiss*.

We note that the rationale for this enhancement is to "target criminals who engage in *complicated* criminal activity because their actions are

41

considered more blameworthy and deserving of greater punishment than a perpetrator of a *simple* version of the crime." *Rice*, 52 F.3d at 851 (emphasis added). But there is a mismatch here. Koch is not "more blameworthy and deserving of greater punishment" because she was involved in a more "complicated" mail-fraud scheme than others who perpetrate a "simple[r]" mail-fraud scheme. *Id.* In the district court's view, Koch was more blameworthy than other fraudsters because her conduct in deceiving the grieving and dismembering and desecrating the dead was, in the district court's words, "egregious," "horrendous," K. App. vol. V, at 343, "heinous," and caused "substantial and ongoing nonmonetary harm to the [next-of-kin] victims," *id.* at 344. But any allegedly greater blameworthiness goes to the district court's consideration of the § 3553 factors and Koch's arguments on substantive reasonableness. If Koch is more blameworthy than other fraud defendants, it is not because her conduct was *sophisticated*.

We therefore reverse the district court's application of the sophisticated-means enhancement as to Koch and remand for resentencing because "[a] sentence is procedurally unreasonable if, among other things, the district court incorrectly calculates the Guidelines sentence or relies on clearly erroneous facts." *Crowe*, 735 F.3d at 1235 (cleaned up). Because we vacate the district court's imposition of Koch's sentence on procedural grounds, we do not reach her substantive unreasonableness arguments. *See United States v. Tom*, 494 F.3d 1277, 1282 (10th Cir. 2007) ("We are required to remand such a sentence

42

on procedural reasonableness grounds—without reaching the question of substantive reasonableness—unless the error is harmless, that is, unless the error in calculating the Guidelines range did not affect the sentence selected." (cleaned up)).

## IV.    The procedural errors were not harmless, and errors in loss calculations may affect restitution.

If a sentencing court's procedural error affects a defendant's substantial rights, then the error is not harmless and we must remand for resentencing. *United States v. Kieffer*, 681 F.3d 1143, 1169 (10th Cir. 2012). In the sentencing context, a harmless error is one that "did not affect the district court's selection of the sentence imposed." *United States v. Lente*, 647 F.3d 1021, 1037–38 (10th Cir. 2011) (citation omitted). Because the Guidelines "are to be the sentencing court's starting point and initial benchmark," *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016) (cleaned up), an error in calculating the Guidelines range is a "significant procedural error," *Gall v. United States*, 522 U.S. 38, 51 (2007). This "error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *United States v. Gieswein*, 887 F.3d 1054, 1061 (10th Cir. 2018) (quoting *Molina-Martinez*, 578 U.S. at 198). And such an error "runs the risk of affecting the ultimate sentence *regardless of* whether the court ultimately imposes a sentence within or outside the range the guidelines suggest." *United States v. Sabillon-Umana*, 772 F.3d 1328, 1333 (10th Cir.

43

2014) (cleaned up). "An error in calculating the sentencing guidelines necessitates remand unless the beneficiary of the error—in this case, the government—proves the error was harmless by a preponderance of the evidence." *United States v. Brooks*, 67 F.4th 1244, 1250 (10th Cir. 2023) (citation omitted)). "Procedural error is harmless if the record viewed as a whole clearly indicates the district court would have imposed the same sentence had it not relied on the procedural miscue(s)." *Gieswein*, 887 F.3d at 1061 (cleaned up). We examine the harmlessness arguments for Hess and Koch in turn.

A. **The district court's procedural errors in sentencing Hess were not harmless.**

The government argues that, even if the district court erred in applying a 14-level enhancement under § 2B1.1(b)(1)(H) for losses exceeding $550,000 to Hess's sentence, "'the record viewed as a whole clearly indicates the district court would have imposed the same sentence had it not relied on' the improperly calculated Guidelines range." H. Resp. Br. at 34–35 (quoting *Kieffer*, 681 F.3d at 1165). The government points us to *Gieswien* as instructive. In *Gieswien*, the defendant was sentenced twice: at the initial sentencing and again on remand, the district court varied upward to impose the statutory maximum of 240 months. 887 F.3d at 1056. On remand, the district court committed a procedural error which affected the defendant's Guidelines

range. *Id.* But we concluded that *Gieswien* was "the rare case" in which a Guidelines range error was "harmless" and did not require resentencing. *Id.*

True, there are similarities between this case and *Gieswien*: There, the district court relied on factors other than the Guidelines range in imposing the statutory maximum sentence. *Id.* at 1063. Similarly here, the district court stated that, "in white collar fraud cases, I am usually inclined to impose a sentence that upward departs from the advisory guideline range." H. App. vol. V, at 193–94. It weighed the "horrendous" nature of the crime and "how it has deeply hurt the victims" against the mitigating factors put forward in Hess's sentencing statement. *Id.* at 193. It cited Guidelines Commentary to justify a variance "for aggravating, nonmonetary objective[s], or for substantial nonmonetary harm." *Id.* at 194. When it imposed the sentence, the district court stated that "the advisory guideline range sentence does not adequately take into account the nonmonetary harm the defendant has inflicted on the victims . . . and it does not provide a sentence range that is sufficient to accomplish the goals of sentencing." *Id.* at 213.

Despite some similarities, the procedural posture was different in *Gieswein* because the district court there had already imposed the statutory maximum twice, and the second time it explained "this decision in great detail." 887 F.3d at 1062; *see id.* at 1056. Reviewing the defendant's reimposed sentence in *Gieswein,* we noted that the district court's "decision [to impose the same maximum sentence] suggests that the court might again impose the same

45

sentence under an even lower advisory range." *Id.* at 1062. But we reasoned that "standing alone, this factor would not be enough to demonstrate harmlessness." *Id.* We identified two additional factors that "tip[ped] the scales toward harmlessness." *Id.* at 1063. First, the district court indicated that it imposed 240 months because this was the statutory maximum, and that it would "impose a higher sentence if possible." *Id.* Second, the district court gave a "cogent" and "thorough explanation for its sentencing determination" to support its "substantial" variance from the Guidelines range. *Id.*

Unlike *Gieswien*, here, the district court has sentenced Hess only once. Though the district court made clear that it was sentencing Hess to the maximum sentence, it did not state that it would have sentenced Hess higher were it not so constrained. Nor did it explain this sentence as thoroughly as the district court did on remand in *Gieswien*. *See Gall*, 552 U.S. at 50 ("[A] major departure should be supported by a more significant justification than a minor one."). So we do not find enough similarities between *Gieswien* and this case to persuade us that this case is similarly "rare." *Gieswein*, 887 F.3d at 1056. At this stage, "[w]e cannot know what impact the initial . . . error in the district court's calculation of the advisory Guidelines range had on the ultimate sentence selected." *Tom*, 494 F.3d at 1282. Indeed, any error "runs the risk of affecting the ultimate sentence" even though the initial sentence imposed was outside the Guidelines range. *Sabillon-Umana*, 772 F.3d at 1333. Because Hess alleged sufficient loss offsets to reduce her Guidelines range from 151–188

46

months to 121–151 months, we conclude that the district court's procedural errors were not harmless.

B.    **The government does not argue that any errors in calculating Koch's sentence are harmless.**

Koch also argues in her opening brief that any miscalculation of her Guidelines range is not harmless error. But it is the government's burden to demonstrate harmlessness and the government did not argue in its response that any procedural errors would be harmless—it has therefore waived that argument. *See Brooks*, 67 F.4th at 1250. Because we agree with Koch that the district court incorrectly applied the 2-level sophisticated-means enhancement, *see* Discussion § III, *supra*, that 2-level decrease in total offense level would change her guidelines range to 97–121 months (for a total offense level of 30, including all other enhancements), from a range of 121–151 months (for her current total offense level of 32). Koch's Guidelines range may be further reduced after the district court's recalculation of loss offsets as described above, and after any remand proceedings on the large-number-of-vulnerable-victims enhancement. *See* Discussion §§ I(B), II, *supra*. As with Hess, we "cannot know what impact" the errors "in the district court's calculation of the advisory Guidelines range had on the ultimate sentence selected." *Tom*, 494

47

F.3d at 1282. We therefore vacate Koch's sentence and remand for further proceedings.[18]

Finally, because a "district court may not order restitution in an amount that exceeds the actual loss caused by the defendant's conduct, which would amount to an illegal sentence," *United States v. Ferdman*, 779 F.3d 1129, 1132 (10th Cir. 2015), if the remand proceedings yield a different amount of actual loss, then the district court must adjust its restitution order accordingly.

## V.     We decline to reassign to a different judge.

Hess argues that we should remand for resentencing to a different judge. Our "inherent power" to reassign cases "exists apart from the judicial disqualification statutes" that are usually invoked at the district court level. *O'Rourke v. City of Norman*, 875 F.2d 1465, 1475 (10th Cir. 1989). But we "remand with instructions for assignment of a different judge only when there is proof of personal bias or under extreme circumstances." *United States v. Slinkard*, 61 F.4th 1290, 1296 (10th Cir. 2023) (quoting *Mitchell v. Maynard*, 80 F.3d 1433, 1448 (10th Cir. 1996)). Absent proof of personal bias, which Hess does not allege, we consider three factors to determine whether reassignment to a different judge is warranted:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous

---

[18] Because we agree that Koch's sentence was procedurally unreasonable, we do not reach her substantive-reasonableness arguments. *See Tom*, 494 F.3d at 1282.

or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* at 1296–97 (quoting *Mitchell*, 80 F.3d at 1450).

First, contrary to Hess's arguments, we do not believe that it will be "difficult for the district court to set aside her belief that all money [that] victims paid Ms. Hess constitutes loss." H. Op. Br. at 24. If, on remand, the district court fails to apply our instructions, Hess may appeal again. *See United States v. Evans*, 677 F. App'x 469, 475 (10th Cir. 2017) (unpublished) ("Even after we rejected the original loss calculation, the district judge reiterated her belief that Mr. Evans had stolen approximately $12 million and expressed regret concerning the inability to order restitution in that amount. Thus, we could reasonably expect our disposition to cause difficulty on second remand." (cleaned up)). As for the district court's views that, "with respect to white collar fraud cases, the sentencing guidelines are quite lenient," so that it is "usually inclined to impose a sentence that upward departs from the advisory guideline range," H. App. vol. V, at 193–94, that consideration goes to the substantive, rather than the procedural, reasonableness of Hess's sentence, which Hess does not challenge on appeal. We acknowledge that in *Evans*, the district court made similar statements that "Americans 'do not take white collar crime seriously enough,'" 677 F. App'x at 475 (quoting record), but that statement was only part of the picture in that case: in *Evans*, the district court

49

had also "stat[ed], before hearing the evidence on the amount of loss, that she would not sentence Mr. Evans within a guideline range resulting from no loss or victim enhancements" and made "statements that the inability to find a higher loss was unfortunate." *Id.* The district court's remarks and rulings in this case do not, at least at this stage, warrant reassignment.

Second, reassignment is not necessary to preserve the appearance of justice. Unlike in *Evans*, the district court has sentenced Hess only once before. *See id.* ("The district judge has already sentenced Mr. Evans twice, and our remand will result in Mr. Evans's third sentencing proceeding for the same offense. Assignment to a different judge would prevent any appearance of impropriety in sentencing Mr. Evans a third time." (cleaned up)). And though it gives us pause, we do not interpret the district court's personal anecdote about grief—legally irrelevant though it was—or its call for a moment of silence to honor the deceased and their families, to signal either personal bias or to defeat the appearance of justice.

Third and finally, given the district court's experience with this case, and given our conclusion that the appearance of justice is undisturbed, "reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Slinkard*, 61 F.4th at 1297 (citation omitted). We therefore decline to reassign this case on remand.

## CONCLUSION

For all the reasons explained above, we vacate Hess's and Koch's sentences, and remand for further proceedings consistent with this opinion.